Larry D. DRAKE and Rosalie E. Drake, Plaintiffs–Appellants,

v.

MINNESOTA MINING & MAN-
UFACTURING COMPANY,
Defendant–Appellee.

No. 97–1809.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1997.

Decided Jan. 21, 1998.

Bobby A. Potters (argued), Indianapolis, IN, for Plaintiffs–Appellants.

Steven L. Jackson (argued), Baker & Daniels, Fort Wayne, IN, for Defendant–Appellee.

Before BAUER, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Larry Drake and Rosalie Drake, a married couple, each filed employment discrimination claims under Title VII, 42 U.S.C. § 2000e, and race discrimination claims under 42 U.S.C. § 1981 against their former employer, Minnesota Mining & Manufacturing Company ("3M"). The Drakes, both of whom are white, alleged that they were subjected to a hostile work environment, retaliation, and constructive discharge from their jobs, all as a result of their association and friendship with black co-workers. Magistrate Judge Cosbey, presiding over the case with the parties' consent, granted summary judgment to 3M on all of the Drakes' claims. We affirm.

## BACKGROUND

The Drakes both began working as hourly production employees at 3M's plant in Hartford City, Indiana in the early 1960s. 3M currently employs about 300 people at the Hartford facility. Beginning in the mid-1970s, 3M did not hire any new production employees for a period of approximately twenty years, ending in 1993. According to the Drakes, before this effective hiring freeze occurred, 3M had hired only one black hourly employee, Bob Bragg, and one black engineer, Tom Shade.[1] Mr. Drake, who was active in the plant's union, was friendly with Bragg and in the late 1970s nominated Bragg for a position as a union committeeman, to which he was elected. In the Spring of 1993,

after Bragg had retired, 3M hired two new black hourly employees, Norman Hawkins and Thomas Anthony. The Drakes quickly befriended both Hawkins and Anthony.

The record is replete with evidence that some of the employees at 3M's plant were racial bigots. For example, Charlie Hamilton, an employee who worked with the Drakes, as well as with Hawkins and Anthony, declared in his affidavit that employees referred to blacks as "niggers", and Hawkins once overheard a white employee twice ask a manager, in reference to Anthony, "What is that lazy nigger doing over there with his glasses off?" In addition, Hamilton's affidavit claimed that Hawkins was required to perform tasks that were not required of similarly situated white employees. Hawkins also claimed that he was paid lower wages because of his race and that he was not given the same opportunity to work overtime as were similarly situated white employees. Mr. Drake, who was an active union member with expertise in grievance procedures, helped Hawkins work out his problems regarding pay rates and overtime hours. Mrs. Drake, who is a minister, provided counseling and spiritual guidance to Hawkins and Anthony regarding the problems that they experienced.

Although the Drakes' counsel asserted that 3M employees began to harass Mr. Drake regarding his friendship with Hawkins and Anthony shortly after they were hired, Mr. Drake's deposition testimony contradicts this account. According to Mr. Drake, his problems began on August 30, 1994, when he was confronted by Phil Glancy, who had been one of his co-workers for over thirty years. Mr. Drake had filed a grievance with the union against Glancy and another hourly employee a few days earlier, alleging that Glancy and the other employee had traded overtime shifts in violation of the union contract.

1. 3M argues that it had in fact employed more than two black individuals at the Hartford City Plant prior to 1993. The Court asked 3M's counsel at oral argument what the correct number was, and counsel directed us to the affidavit of Dean Coleman, 3M's Human Resources Director. The affidavit states that "[a] number of minority employees were employed at 3M Hartford City through the 1970s and the early 1980s." View-ing the evidence in the light most favorable to the Drakes, as we must at the summary judgment stage, see, e.g., O'Connor v. DePaul Univ., 123 F.3d 665, 669 (7th Cir.1997), and recognizing that affidavits submitted in support of a summary judgment motion "shall set forth such facts as would be admissible in evidence," FED.R.CIV.P. 56(e), we accept the Drakes' factual assertion regarding 3M's past hiring record.

When Mr. Drake reported for work on the 30th, which was apparently the first time that he came into contact with Glancy after he filed the grievance, Glancy confronted Mr. Drake at the plant's time clock. With other employees present, an argument regarding Mr. Drake's grievance ensued in which, according to Mr. Drake, Glancy "jumped on my case" and "went off on me like a madman." During the argument Glancy said to Mr. Drake, "Why don't you take your nose and put it up the black's ass like you have always got it and keep it there?" Mr. Drake complained about the incident to Human Resources Director Dean Coleman, who investigated the incident. Coleman concluded his investigation within one week and decided to suspend both employees without pay for their unprofessional conduct.

While Coleman was conducting his investigation, Mr. Drake was "shunned" by his co-workers. Mr. Drake claims that no one would talk to him at the plant and that whenever he or Mrs. Drake went into the plant's break room, the other workers would "get up and walk off." Mr. Drake never asked anyone why they were shunning him because, he believes, it was obvious that his treatment was the result of his association with Hawkins and Anthony. Mr. Drake never complained to Coleman or any other 3M manager regarding this treatment and took a disability leave for an unrelated condition on September 6. At some point during his leave, Mr. Drake asked his wife to retrieve some personal effects from his locker. Mrs. Drake was told that the lock had been cut and her husband's belongings had been removed pursuant to a company policy that had deemed his locker abandoned. The belongings were turned over to her; Mr. Drake claims that some of his union books and papers were missing. Mr. Drake ultimately retired in February 1995 without ever returning to work at the plant.

Following Mr. Drake's confrontation with Glancy, Mrs. Drake had trouble with Glancy's brother, Jim Glancy, a forklift driver responsible for stocking her work station. When Mrs. Drake told Dean Coleman that Jim was not stocking her station, Coleman talked to Jim and the problem was resolved within one day. Other than this incident, Mrs. Drake had no problems with her co-workers until December 11, 1994, which was around the time that the local newspaper ran a series of articles regarding racial tensions at the 3M plant. In an article published on December 12, Mr. Drake, who was still on disability leave, was quoted as stating that Hawkins and Anthony "were being treated like dogs" at the 3M plant. Mrs. Drake claims that she was shunned by all but a handful of her co-workers as a result of these articles. Although she talked to Coleman regarding this treatment, she told him that she did not want him to do anything in particular except to talk to one employee. Mrs. Drake told Coleman that the treatment she was receiving was not affecting her work production or safety. She took a medical leave in mid-December for ten days, returned to work in late December, and went on leave again on February 21, 1995. On one occasion prior to taking her second disability leave, one of Mrs. Drake's co-workers told her that he feared for her safety and advised her to leave the plant. Mrs. Drake retired during her second leave.

Following the publication of the newspaper articles, Mr. Drake also received three sexually explicit, racially tinged, telephone calls at his and Mrs. Drake's home. Mrs. Drake told Coleman about the calls, although she did not tell him specifically what the callers had said. Coleman told Mrs. Drake that he would look into the matter, and he later told her that it was impossible to determine whether the calls had been made from the plant.

In the district court, Mr. and Mrs. Drake each stated a claim for hostile environment race discrimination. Magistrate Judge Cosbey granted summary judgment on Mr. Drake's claim because the evidence did not support an inference that any harassment he had endured was a result of his association with black employees. With respect to Mrs. Drake's claim, the court granted summary judgment because the evidence did not even establish an inference of racial association cognizable under Title VII. In the alternative, the court determined that neither of the Drakes had established a prima facie case of hostile environment harassment. The

Drakes also stated claims of retaliation; the district court found that neither of them had established a prima facie case. Last, the Drakes filed claims that they had been constructively discharged by 3M. The district court found that their work conditions did not approach the intolerable level necessary to support such claims.

## DISCUSSION

### A. Appellate Jurisdiction

Before reaching the merits of the Drakes' appeals, we must resolve the question of our appellate jurisdiction. As indicated above, the Drakes and 3M purported to consent to have their case tried before a magistrate judge. Because magistrate judges do not have the power to enter a final appealable judgment unless the parties enter their consent, see 28 U.S.C. § 636(c)(1), Circuit Rule 28(b)(2)(v) requires that when an appeal under 28 U.S.C. § 636(c)(3) is taken from the decision of a magistrate judge, the jurisdictional statement in the appellants' brief shall state "the dates on which each party consented in writing to the entry of final judgment by the magistrate." Yet the Drakes' brief did not include this information. 3M, which was required by Circuit Rule 28(c) to correct any errors or omissions in the appellants' jurisdictional statement, accepted the Drakes' statement as "complete and correct". Our further attempts to locate in the record the signed consents of the Drakes and 3M proved unavailing.

■ At oral argument, counsel for the Drakes suggested that 3M's acceptance of the Drakes' jurisdictional statement obviated any difficulties posed by the failure to comply with our Circuit Rule. It is a basic principle, however, that the parties cannot stipulate to the subject-matter jurisdiction of the federal courts and, "in the absence of consent, review of a magistrate judge's decision lies in the district court." *Stanley v. Amoco Oil Co.*, 965 F.2d 203, 204 (7th Cir.1992) (per curiam). Valid consent is essential to the constitutionality of § 636(c), and that consent must be explicit, clear, and unambiguous. *See Silberstein v. Silberstein*, 859 F.2d 40, 42 (7th Cir.1988). It is no less essential that the

parties clearly inform this Court of the particulars that support our jurisdiction, as the Circuit Rules require. *See Stanley*, 965 F.2d at 203–04. Despite the parties' initial failure in this regard, the Court at oral argument gave the Drakes' counsel ten days to file the consents. We received them within the ten-day period, and they indicate that both the Drakes and 3M consented to trial by a magistrate judge. Thus, having satisfied our jurisdictional concerns, we may proceed to the merits of the appeal.

### B. 3M's Summary Judgment Motion

■ Mr. and Mrs. Drake each argue that the district court erred in granting summary judgment against them on all of their claims. They argue that their claims were inappropriately dismissed at the summary judgment stage because they presented evidence that created a genuine issue of material fact with respect to each of their claims. We review a summary judgment *de novo*, and we will consider the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See, e.g., Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 511–12 (7th Cir.1996). Summary judgment is appropriate only if the evidentiary record indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). We apply this standard with added rigor in employment discrimination cases, in which intent and credibility are crucial issues. *See Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). "Because evidence directly supporting a claim of intentional discrimination is rare, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Courtney*, 42 F.3d at 418.

#### 1. The Hostile Work Environment Claims

The Drakes' complaints alleged that they were subjected to a hostile work environment, in violation of 42 U.S.C. §§ 1981 &

2000e–2(a)(1),[2] due to their association with their black co-workers. 3M concedes that an employee can bring an associational race discrimination claim under Title VII and § 1981, so long as the employee can establish the requisite level of association. However, most of the cases cited by 3M in support of this proposition, including the two opinions of this Court, addressed retaliation claims. *See Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1316 (7th Cir.1989) (Cudahy, J., concurring) (discussing, prior to the 1991 Civil Rights Act, whether a retaliation claim could be stated under § 1981); *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir.1982) (Title VII retaliation case); *see also Skinner v. Total Petroleum, Inc.*, 859 F.2d 1439, 1447 (10th Cir.1988) (Title VII and § 1981 retaliation case). These precedents provide little guidance with respect to discrimination claims, as Title VII's retaliation provision forbids an employer to retaliate against an employee because "he has opposed any practice made an unlawful employment practice" under Title VII. *See* 42 U.S.C. § 2000e–3(a).

■ Other cited cases support the proposition of an associational race discrimination claim. *See, e.g., Moffett v. Gene B. Glick Co.*, 621 F.Supp. 244, 267 (N.D.Ind.1985), *overruled on other grounds by Reeder–Baker v. Lincoln Nat'l Corp.*, 644 F.Supp. 983 (N.D.Ind.1986); *Gresham v. Waffle House, Inc.*, 586 F.Supp. 1442, 1444–45 (N.D.Ga. 1984). Those cases both emphasize, however, that the alleged discrimination was because of the employee's race, as § 2000e–2(a) requires, in conjunction with the employee's association with an individual of another race. *See Moffett*, 621 F.Supp. at 267; *Gresham*, 586 F.Supp. at 1444–45. Although we need not decide this issue because 3M has conceded it, we must address 3M's argument that some objectively quantifiable "degree of association" is required in order to state an associational claim. In this context, we note

that employment discrimination claims are available to employees of all races, *see McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), so long as the discrimination is "because of such individual's race". 42 U.S.C. § 2000e–2(a)(1). Accordingly, we believe that the key inquiries should be whether the employee has been discriminated against and whether that discrimination was "because of" the employee's race.[3] Contrary to 3M's assertions, we do not believe that an objective "degree of association" is relevant to this inquiry.

■ Reviewing the evidence in the record, we conclude that neither of the Drakes established an inference that they were subjected to a hostile work environment because of their race. With respect to Mr. Drake, he has not established an inference that any harassment to which he was subjected was based on his race, in conjunction with his association with Hawkins and Anthony. Although Mr. Drake had been friends with Hawkins and Anthony since the Spring of 1993, he stated at his deposition that the first instance of harassment allegedly based upon his friendship with Hawkins and Anthony was his August 30th altercation with Glancy. Mr. Drake acknowledged that Glancy was angry at him for filing a grievance against him, and that Glancy "went off" on him "like a madman" as a result. Mr. Drake introduced no evidence that the subsequent treatment he received from his co-workers was a result of his race. In fact, the evidence in the record suggests that his problems resulted from filing the grievance against Glancy. Mrs. Drake admitted in her deposition testimony that, during her tenure of over thirty years at the 3M plant, she could not recall a single other instance in which an employee had filed a grievance against a co-worker when the filing employee had no personal stake in the dispute. Even when viewing the evidence in the light most favorable to Mr.

**2.** The parties have not addressed whether the elements required to state a cause of action under § 1981 differ at all from the requirements under Title VII, and we assume that they are identical for the purposes of our decision.

**3.** Of course, in some instances, harassment will be tied inextricably to an employee's association with individuals of another race. *See, e.g., Moffett*, 621 F.Supp. at 255 (recounting incidents in which the plaintiff, a white woman who was married to a black man, was subjected to anti-black racist statements from her co-workers).

Drake, we are unable to conclude that he has established an inference that he was harassed because of his race.

Moreover, the single statement made by Glancy to Mr. Drake does not establish an inference of a hostile environment. We have previously noted that "isolated and innocuous incidents will not support a hostile environment claim." *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir.1996). Although not innocuous, the comment was an isolated incident. Thus, summary judgment was appropriate with respect to Mr. Drake's hostile environment claim.

 With respect to Mrs. Drake's hostile environment claim, the evidence does not establish an inference that she was subjected to a hostile environment actionable under the antidiscrimination laws. "For the harassment to be actionable, it must be sufficiently severe or pervasive so as to alter the conditions of the victim's employment and to create an abusive working atmosphere." *Id.* at 479. Because "Title VII is not directed against unpleasantness per se but only ... against discrimination in the conditions of employment," *Carr v. Allison Gas Turbine*, 32 F.3d 1007, 1009 (7th Cir.1994), we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

 Given the above considerations, we conclude that Mrs. Drake has not established an inference of a hostile environment in either the subjective or objective sense. Mrs. Drake talked with Dean Coleman regarding the treatment that she was receiving, and informed him that her performance at work was not suffering. Moreover, even assuming that any inappropriate treatment

directed towards Mrs. Drake was because of her race, we cannot hold that the treatment directed towards her was so severe that it "unreasonably interfered" with her work environment.[4]

2. The Retaliation Claims

 The Drakes also claim that 3M retaliated against them in a number of ways. As indicated previously, it is "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse action by his employer; and (3) that there was a causal link between the protected expression and the adverse action. *See, e.g., McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997). While we have defined adverse employment actions quite broadly, *see McDonnell v. Cisneros*, 84 F.3d 256, 258–59 (7th Cir.1996), it remains true that the adverse action must be material. *See Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996). "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996) (quoting *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996)).

 With respect to Mr. Drake's retaliation claim, only his comments printed in the local newspaper regarding race relations at the 3M plant can be characterized as protected expression. *See Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th

---

**4.** The allegedly hostile environment directed towards the Drakes was primarily due to the conduct of their co-workers. Of course, only employers can be liable under Title VII, *see, e.g., Williams v. Banning*, 72 F.3d 552 (7th Cir.1995), and only those employers who are at least negligent in failing to prevent the hostile environment harassment of co-workers will be held liable.

*See Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 495 (7th Cir.1997) (en banc) (per curiam). 3M argues that it took steps that were reasonably likely to stop the Drakes' harassment such that it would not be liable. Because the Drakes have not established actionable harassment, we need not reach this argument.

Cir.1982) (noting that an employee's good faith belief that he was opposing discrimination, even if that belief was incorrect, triggers Title VII's retaliation provisions). Although Mr. Drake argues that the aid he gave Hawkins in filing grievances also constituted protected expression, *see McDonnell,* 84 F.3d at 262 (recognizing that an employee's endeavors to obtain his employer's compliance with Title VII can form the basis of a retaliation claim), our conclusion that any shunning of Mr. Drake by his co-workers was not because of his race also applies here. The evidence does not create an inference that the shunning was the result of the assistance that he provided his friends. Therefore, since the shunning is not actionable as retaliation, the only allegedly retaliatory adverse actions to which Mr. Drake can point are the three phone calls that he received and the paperwork that was missing from his locker.[5] These unfortunate occurrences, particularly the paperwork that was lost from Mr. Drake's locker, do not rise above the level of "minor" and are not the sort of employee grievances with which the Equal Employment Opportunity Commission and the federal courts should be burdened. *See Williams,* 85 F.3d at 274. Moreover, Mr. Drake has presented no evidence indicating that 3M bears any responsibility for the three obscene telephone calls that he received. *See Knox v. Indiana,* 93 F.3d 1327, 1334–35 (7th Cir.1996).

With respect to Mrs. Drake, we do not believe that the spiritual guidance and friendship that she provided to Hawkins and Anthony constitutes protected activity. However, we will assume that she is protected from retaliation based on her husband's protected activities, as well. *See McDonnell,* 84 F.3d at 262 (holding that victims of "collective punishment" who are genuinely retaliated against should be protected under Title VII's retaliation provision). Mrs. Drake argues that the shunning she received is an actionable form of retaliation. Although retaliation can take the form of a hostile work environment, *see Knox* at 1334–35, we have already held that the terms and conditions of her employment were not affected by the shunning. With respect to her decision to leave the 3M plant on the advice of a co-worker who feared for her safety, she has introduced no evidence that connects 3M to this incident. *See id.* at 1334 (requiring the plaintiff to establish the right link "between the employer and the coworkers, so that the employer can be held responsible for their actions"). Thus, summary judgment on the Drakes' retaliation claims was appropriate.

3. The Constructive Discharge Claims

Mr. and Mrs. Drake also argue that they were constructively discharged from their jobs. "To state a claim for constructive discharge, a plaintiff needs to show that his working conditions were so intolerable that a reasonable person would have been compelled to resign." *Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996). Not only must conditions be intolerable; for a Title VII constructive discharge claim to succeed, they must be intolerable because of unlawful discrimination. *See Chambers v. American Trans Air, Inc.,* 17 F.3d 998, 1005 (7th Cir.), *cert. denied,* 513 U.S. 1001, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994). More than ordinary discrimination is necessary to establish a constructive discharge claim; in the "ordinary" case, an employee is expected to remain employed while seeking redress. *See Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1015 (7th Cir.1997).

Both of the Drake's allegations fall well short of this high standard. At most, the shunning that each of the Drakes re-

---

**5.** Both of the Drakes also claim that 3M retaliated against them by not offering employment to their daughter on three separate occasions. Our case law has in the past suggested that adverse action must be job-related to establish retaliation under Title VII. *See, e.g., Reed v. Shepard,* 939 F.2d 484, 493 (7th Cir.1991). While this asserted form of retaliation is not "job-related" with respect to Mr. and Mrs. Drake, our "[m]ore recent cases have cast a significant shadow on the earlier view that an employer's retaliation in the pretermination situation must be job-related." *McKenzie v. Illinois Dep't of Transp.,* 92 F.3d 473, 486 (7th Cir.1996). In any event, the Drakes have made no effort to demonstrate that 3M's legitimate, nonretaliatory reasons for not hiring the Drakes' daughter are pretextual. *See, e.g., id.* at 483. We therefore reject this claim of retaliation, as well.

ceived suggests that their experience in the workplace was unpleasant; nothing suggests that this treatment was so intolerable that it should have caused either of them to resign. The fact that Mr. Drake felt compelled to resign after being shunned for a few days does not demonstrate that a "reasonable" employee would have acted similarly. While Mrs. Drake suggests that she retired out of fears for her safety, she has presented no evidence to suggest that this fear was reasonable. More significantly, she has not presented evidence suggesting that this fear was the result of discrimination by 3M. In fact, the record indicates that on the only occasion in which Mrs. Drake discussed her shunning with 3M management, she told Dean Coleman, the Human Resources manager, that she did not want him to intervene. Summary judgment, therefore, was appropriately granted on the Drakes' constructive discharge claims.

### 4. The Magistrate Judge's Exclusion of Evidence

■ Mr. and Mrs. Drake also argue that the magistrate judge erred in disregarding portions of affidavits that they submitted in opposition to summary judgment and that this evidence, if admitted, would have gone even further in establishing genuine issues of material fact. The affidavits in question were those of Dave Shevely, Hawkins, and Hamilton, three of the Drakes' co-workers. 3M argues that the district court correctly ignored portions of these affidavits because the affiants' statements lack the factual foundation and personal knowledge required by Rule 56(e) of the Federal Rules of Civil Procedure. Rule 56(e) requires that affidavits offered in opposition to summary judgment "be made on personal knowledge, ... set[ting] forth such facts as would be admissible in evidence, and ... show[ing] affirmatively that the affiant is competent to testify to the matters stated therein." Although "personal knowledge" may include inferences and opinions, those inferences must be substantiated by specific facts. *See, e.g., Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988).

■ The district court was correct to strike these portions of the affidavits. While we will not delve into each statement individually, the portion of the Shevely affidavit that was stricken stated that: "Management, especially Dean Coleman, took a scapegoat approach in dealing with employee problems and generally tended to cover up matters." Similarly, Hawkins stated that: "Every time I, or any other African American employee went to Dean Coleman with a problem involving another employee, who was white, Dean Coleman would never conduct an investigation or take any action against that white employee." These are exactly the type of conclusory allegations that Rule 56 counsels should be disregarded on summary judgment. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Hadley v. County of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983), *cert. denied*, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984).

While the Drakes argue that Shevely's long tenure at 3M's plant qualifies him to make the assertions contained in his affidavit, this argument misapprehends Rule 56(e)'s requirements. Instead, Sheveley's affidavit should have recounted factual instances, based upon Sheveley's personal knowledge, that demonstrated Dean Coleman's tendency to "cover up" matters. Without these substantiating facts, under Rule 56 we cannot make the reasonable inferences that the Drakes assert militate against summary judgment. *See Davis*, 841 F.2d at 189 ("Because Davis substantiates his allegations of a longstanding custom or policy solely on the basis of his one conclusory sentence in his affidavit, we cannot reasonably infer that such a custom did indeed exist without more."). The district court correctly disregarded these conclusory statements in deciding whether to grant summary judgment.

### CONCLUSION

For the foregoing reasons, we affirm the district court's entry of summary judgment in favor of 3M on all claims.