**Robert TUTMAN, Plaintiff,**

v.

**WBBM–TV/CBS INC., Defendant.**

**No. 96 C 4424.**

United States District Court, N.D. Illinois, Eastern Division.

April 29, 1999.

Yvonne Owens, Owens and Associates, Chicago, IL, for plaintiff.

Linda L. Listrom, Debbie L. Berman, Jenner & Block, Chicago, Illinois, for defendant.

## ORDER

BUCKLO, District Judge.

The court has conducted a de novo review of both the factual findings and legal analysis of Magistrate Judge Denlow's Report and Recommendation. The court agrees with Judge Denlow's well reasoned and thorough analysis and therefore adopts the Report dated March 30, 1999 in its entirety. Accordingly, defendant's motion for summary judgment on all claims [69-1] is granted and judgment is entered in favor of defendant, CBS and against plaintiff. Any pending motion in this case is terminated as moot. Status hearing set for 4/30/99 is vacated.

## REPORT AND RECOMMENDATION

MORTON DENLOW, United States Magistrate Judge.

Robert Tutman ("Plaintiff" or "Tutman") instituted this action against WBBM–TV/CBS Inc. ("Defendant" or "CBS") and an employee of Defendant, Robert Vasilopulos ("Vasilopulos"). Counts I and II involved state law tort claims directed at Vasilopulos which were previously dismissed. Count III is directed solely at Defendant and charges it with violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e. Count III includes three claims: a retaliation claim, a hostile work environment claim, and a constructive discharge claim. Defendant now brings a motion for summary judgment on Count III arguing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. For the following reasons the Court recommends that Defendant's motion for summary judgment be granted because the facts viewed in the light most favorable to the Plaintiff demonstrate that the Defendant did not violate Title VII.

## I. Factual Background

The following facts are undisputed unless indicated otherwise. Plaintiff Robert Tutman ("Plaintiff") was an employee of CBS through November 22, 1995. (Def.'s Local Rule 12(M) Statement of Undisputed Facts ("Def.'s 12(M)") ¶ 5.) He was assigned to WBBM–TV as a cameraman. *Id.* Tutman's direct supervisor was Kevin Yokley who reported to Andrea Jenkins. (Def.'s 12(M) ¶¶ 6–7.) Tutman also reported to Jenkins. (Def.'s 12(M) ¶ 8.) Vasilopulos was employed by CBS as a sports producer at WBBM–TV. (Def.'s 12(M) ¶ 9.)

### A. The Incident

On Friday, May 19, 1995, Tutman was in the WBBM–TV sports office talking to sportscaster, Tim Weigel. (Def.'s 12(M) ¶ 13.) While Tutman was in the office, Vasilopulos walked in and said to Tutman, "Get the fuck out of the office before I pop a cap in you're ass." (Def.'s 12(M) ¶ 16.) Tutman responded to Vasilopulos that the phrase was "bust a cap" not "pop a cap." (Def.'s 12(M) ¶ 17.) Vasilopulos then asked Tutman if he had ever seen a movie called "Niggers With Hats." (Def.'s 12(M) ¶ 18.) Tutman stated that those types of movies make a lot of money and Tutman would help Vasilopulos make such a movie. (Def.'s 12(M) ¶¶ 19–20.) Tutman perceived Vasilopulos's statements and actions to be a serious threat to Tutman's life made on account of Tutman's race. (Pl.'s Modified Local Rule 12(N) Response to Defendant's Local Rule 12(M) Statement of Material Facts ("Pl.'s 12(N) Response") ¶ 21.) A number of WBBM–TV employees witnessed the exchange. (Def.'s 12(M) ¶ 23.)

### B. The Investigation

Following the exchange, both Tutman and Vasilopulos left the sports office. (Def.'s 12(M) ¶ 24.) Tutman went directly to Jenkins and informed her of the incident. (Def.'s 12(M) ¶¶ 7–9, 25.) Tutman left the station shortly thereafter to go home. (Def.'s 12(M) ¶ 28.) On his way home, Tutman called D.E. Simmons, a consultant hired by CBS to address employees' workplace concerns, to inform Simmons of the incident as well. (Def.'s 12(M) ¶¶ 29–31.) After talking to Tutman, Simmons phoned Jenkins and the two arranged to meet that night to discuss the incident. (Def.'s 12(M) ¶¶ 35–36.) After their discussion, the two informed John Lansing, the news director, of Tutman's concerns. (Def.'s 12(M) ¶¶ 27, 38.) Lansing questioned both Weigel and Vasilopulos about the incident. (Def.'s 12(M) ¶¶ 39–40.)

The following Monday, Tutman called CBS to express that he was not comfortable coming to the station because the incident with Vasilopulos had not been resolved. (Def.'s 12(M) ¶ 42.) CBS accommodated Tutman by giving him his

assignments over the phone. (Def.'s 12(M) ¶¶ 43.) At the end of his shift Tutman requested and attended a meeting with Robert McGann, the general manager, to inform McGann of the incident. (Def.'s 12(M) ¶¶ 44–46.) Following that meeting, McGann met with Jenkins and Lansing. (Def.'s 12(M) ¶ 48.) McGann initiated his own investigation into the incident which began with a meeting with Vasilopulos. (Def.'s 12(M) ¶¶ 51–52.) McGann's goal for this meeting was to communicate to Vasilopulos that CBS was taking Tutman's allegations seriously and to give Vasilopulos a chance to explain his view of what had occurred. (Def.'s 12(M) ¶ 53.) McGann also informed CBS's human resources department of the incident and it was determined that that department would continue the investigation. (Def.'s 12(M) ¶¶ 56–57.) In addition, CBS's Director of Policy and Administration, Sandra Spangenberg, traveled from New York to conduct an investigation. (Def.'s 12(M) ¶ 58.) After interviewing Tutman, Vasilopulos, and other witnesses, Spangenberg recommended giving Vasilopulos a written warning. (Def.'s 12(M) ¶¶ 59, 61.)

### C. CBS's Disciplining of Vasilopulos

At the conclusion of these investigations, CBS determined that Vasilopulos did not pose a physical threat to Tutman but, because his conduct had been inappropriate, CBS believed that Vasilopulos should be disciplined. (Def.'s 12(M) ¶¶ 66–67.) One possible course of action that CBS explored was terminating Vasilopulos. (Def.'s 12(M) ¶¶ 68, 73.) The parties dispute whether CBS policy mandated terminating Vasilopulos. (See Def.'s 12(M) ¶¶ 68–73; Pl.'s 12(N) Response ¶¶ 68–73.) CBS policy relating to the incident is as follows.

> CBS will not tolerate any form of harassment on account of race, color, national origin, religion, sex, age, sexual orientation.... The Company will investigate any issue as it arises and will take

appropriate action. Any employee who engages in such harassment will be subject to discipline, up to and including termination.

(Pl.'s Ex. 5, CBS Policy, General, Fair Employment Practices.)

> The following categories are examples of conduct which may be grounds for immediate discharge.... Each situation is to be judged on a case-by-case basis....
> *Misconduct*
> Conduct which is adverse to the safety and welfare of CBS or its employees, including, but not limited to, any act of violence to property or person.... or any behavior, which in the sole discretion of CBS, endangers CBS' employees, premises, or property or presents a threat of such danger....

(Pl.'s Ex. 5, CBS Policy, Discipline and Termination, *Misconduct.*) After its investigation, CBS concluded that Vasilopulos's conduct did not fall within the *Misconduct* category and that terminating Vasilopulos was not warranted because Vasilopulos had not intended for his comments to be threatening. (Def.'s 12(M) ¶¶ 68, 73.)

CBS decided on a three-part response to Vasilopulos's conduct. (Def.'s 12(M) ¶ 74.) First, CBS gave Vasilopulos a written warning and placed a copy in Vasilopulos's personnel file. (Def.'s 12(M) ¶¶ 75, 77.) The warning emphasized that Vasilopulos's conduct was inappropriate even though Vasilopulos did not intend for Tutman to feel threatened. The letter also stated that any further incidents of this type would result in serious consequences, including possible termination. (Def.'s 12(M) ¶ 76.) Second, CBS sent Vasilopulos to a three-day Interpersonal Skills Workshop which focused on promoting better relationships in the workplace. (Def.'s 12(M) ¶¶ 78–79.) Finally, CBS required Vasilopulos to apologize to Tutman. (Def.'s 12(M) ¶¶ 80.) While Vasilopulos prepared a letter which was sent to Tutman, (Def.'s 12(M) ¶¶ 84–86), the parties dispute whether the letter constitutes an apology, (Pl.'s 12(N) Response ¶ 84). CBS

also recirculated its anti-discrimination and fair employment policies to all WBBM–TV employees. (Def.'s 12(M) ¶ 87.)

## D. Tutman Placed on Medical Leave

Tutman worked on May 22, 1995 but refused to return to work after that on the grounds that he still felt unsafe at work. (Def.'s 12(M) ¶ 88.) Consequently, CBS placed Tutman on paid medical leave of absence. (Def.'s 12(M) ¶ 89.) Tutman did not request that CBS do so. (Pl.'s Modified Local Rule 12(N) Statement of Additional Facts ("Pl.'s 12(N) Statement") ¶ 20.) While the parties dispute what should have occurred after Tutman spent six months on medical leave of absence, the content of the corporate medical leave policy is not disputed. (See Def.'s 12(M) ¶¶ 89–94; Pl.'s 12(N) Response ¶¶ 89–94.) The content of the policy is as follows. An employee may not remain on a medical leave of absence for more than six months. (Def.'s 12(M) ¶ 90.) At the end of six months, the employee must either return to work if medically able to or apply for long term disability benefits if medically qualified to do so. (Def.'s 12(M) ¶ 91.) An employee who does neither will, at the expiration of six months, be deemed to have voluntarily resigned. (Def.'s 12(M) ¶ 92.)

While Tutman was on leave, members of CBS's management telephoned him in an effort to get him to return to work. (Def.'s 12(M) ¶ 95.) They responded to his fear of Vasilopulos by offering him, if he returned to work, the option of selecting different shifts and receiving his assignments by telephone in order to insure that Tutman would not have contact with Vasilopulos. (Def.'s 12(M) ¶ 96.) Tutman did not return to work at the time that CBS contacted Tutman with these suggestions. He also did not return to work later when CBS contacted him to inform him that he would need to return to work when the six-month medical leave expired. (Def.'s 12(M) ¶¶ 97–98.)

## E. Tutman Terminated

Tutman requested an extension of the leave stating that he needed to exercise in order to be in sufficient physical shape to return to work. (Pl.'s Response 12(N) ¶ 100.) CBS informed Tutman that it had denied his request for an extension of his medical leave and that if he failed to return to work on November 22, 1995, the day his six-month leave expired, he would be deemed to have voluntarily resigned. (Def.'s 12(M) ¶ 103.) CBS refused to extend Tutman's medical leave providing as its stated reason CBS's preexisting strict policy to not extend medical leave beyond the six-month allowed time period. (Def.'s 12(M) ¶ 104.) Tutman was deemed to have voluntarily resigned on November 22, 1995 when he failed to return to work and failed to apply for long term disability. (Def.'s 12(M) ¶¶ 108–09.) Thereafter Tutman filed his complaint with the EEOC and instituted this litigation. (Def.'s 12(M) ¶ 111.)

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

When reviewing the record on summary judgment, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. See Larimer v. Dayton Hudson Corp., 137 F.3d 497, 500 (7th Cir.1998). To avert summary judgment, however, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A dispute about a material fact is genuine only if the evidence presented is

such that a reasonable jury could return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

## III. The Motion for Summary Judgment

### A. The Retaliation Claim

 The Court recommends granting Defendant's motion for summary judgment on the retaliation claim because the evidence does not show that Tutman's request for extended leave was denied in retaliation for his complaint about Vasilopulos. To establish a prima facie case of retaliation, a plaintiff must meet three elements: (1) the plaintiff engaged in protected expression; (2) the plaintiff suffered an adverse action; and (3) there was a causal link between the protected expression and the adverse action. *Drake v. Minnesota Mining and Manufacturing Co.*, 134 F.3d 878, 885 (7th Cir.1998) (citing *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir.1997)). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the alleged adverse action. *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 483 (7th Cir.1996). If this is achieved, the burden then shifts back to the plaintiff to show that the defendant's stated reason for the action is pretextual. *Id.* There is no dispute that Plaintiff has met the first two elements. The retaliation claim turns on the issue of whether there is a fact question regarding the causal link.

### 1. The Causal Link

 CBS is entitled to summary judgment on Tutman's retaliation claim because Tutman has offered insufficient evidence to make out a prima facie retaliation claim. Tutman has failed to establish a causal link between the protected expression and the adverse action. In order to establish the requisite causal link, a plaintiff must prove that the defendant would not have taken the adverse action but for the plaintiff's protected expression. *McKenzie*, 92 F.3d at 483. This Tutman has failed to do. Tutman has introduced no evidence to show that the adverse action CBS took was caused by Tutman's earlier complaints about Vasilopulos. Rather the evidence is clear that Plaintiff was terminated because he failed to return to work following the end of his six month medical leave.

Plaintiff's allegations regarding a causal link between Plaintiff's complaint about Vasilopulos and Plaintiff's deemed resignation are limited to the following paragraph:

> Mr. Tutman notified CBS of his intention to file a Charge of Discrimination by correspondence dated October 20, 1995. CBS met with Mr. Tutman and his attorneys on November 13, 1995. During this meeting, Mr. Tutman's attorneys requested an extension of the medical leave of absence to Mr. Mark Engstrom. Four days after the meeting, Mr. Mark Engstrom denied Mr. Tutman's request for extension of medical leave of absence.

(Pl.'s 12(N) Response ¶ 104 (citations omitted).) The most that Tutman shows is that CBS knew of his complaints at the time that it took the adverse action. However, knowledge is insufficient to establish a causal link. *See Gibson v. Old Town Trolley Tours*, 160 F.3d 177, 182 (4th Cir. 1998) (holding that judgment as a matter of law was proper when the plaintiff "did not present any evidence that [the defendant] was motivated by the EEOC complaint. Knowledge is necessary to establish causation, but it is not sufficient."). In addition, the mere occurrence of the adverse action after the protected expression is insufficient to support a presumption of causation. *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir.1998) ("Post hoc ergo propter hoc [After this hence on account of this] is not enough to support a finding of retaliation."). As a result, in that Plaintiff has come forward with no evidence to establish a causal link,

summary judgment in favor of Defendant is appropriate on the retaliation claim.

### 2. The Reason for the Adverse Action as Pretext

■ Even if Tutman were able to make out a prima facie retaliation claim, CBS is entitled to summary judgment on Tutman's retaliation claim because Tutman has offered no evidence to show that CBS's reason for not extending Tutman's medical leave was pretext. CBS's stated reason for not extending the medical leave was that CBS's policy does not allow medical leave to be extended beyond six months and no exceptions are made to this limitation. The *McKenzie* case is directly on point. 92 F.3d 473. In that case the adverse action suffered by the plaintiff was her employer refusing to allow her to leave the premises during her breaks. *Id.* at 484. However, the employer explained that it was the company's policy that no employee was allowed to leave during break times. *Id.* The Seventh Circuit stated that, even assuming that the plaintiff had established a prima facie case of retaliation, she failed to present any evidence tending to disprove that the break policy applied to all employees. *Id.* Because the plaintiff was unable to prove that the stated explanation for the adverse action was pretext, the Seventh Circuit affirmed the grant of summary judgment against her on the retaliation claim. *Id.*

In the present case, Tutman also provided no evidence to cast doubt on the stated reason given by CBS for not extending his medical leave. In both the present case and *McKenzie,* the employer stated that the reason for the adverse action was adherence to policy. Tutman was unable to give examples of other employees for whom an exception to the leave policy was made. (See Pl.'s 12(N) Response ¶ 105.) Consequently, in the present case, as in *McKenzie,* Plaintiff has failed to present any evidence tending to cast doubt on the testimony that the policy applied to all

employees. As a result, Plaintiff cannot maintain a cause of action for retaliation.

### B. The Hostile Work Environment Claim

■ The Court also recommends granting Defendant's motion for summary judgment on the hostile work environment claim. Although the Court concludes that Plaintiff did create a genuine issue of material fact as to the existence of a hostile work environment, the Court concludes that CBS's response to Tutman's complaint was prompt and appropriate. In order to establish a claim of hostile work environment, a plaintiff must meet three elements. First, he must show that he subjectively believed that the alleged wrongdoer's conduct created a racially hostile environment. *McKenzie,* 92 F.3d at 480. Second, he must show that the alleged wrongdoer's conduct objectively created a racially hostile environment. *Id.* Finally, he must show that the defendant knew, or should have known, of the alleged wrongdoer's conduct and the defendant failed to take prompt and appropriate remedial action in response to that conduct. *Id.* (citing *Brooms v. Regal Tube Co.,* 881 F.2d 412, 421 (7th Cir.1989)).

If an employer takes reasonable steps to discover and rectify the harassment of its employees, however, it has discharged its legal duty. *Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 431 (7th Cir.1995). "An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Brooms,* 881 F.2d at 421. We are not to focus "solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed." *Id.* The reasonableness of an employer's response depends, in

part, on the gravity of the harassment alleged. *Baskerville,* 50 F.3d at 432. *McKenzie,* 92 F.3d at 480.

### 1. The Single, Isolated Incident of Harassment

█ Tutman has offered sufficient evidence of harassment to create a genuine issue of material fact as to the existence of a hostile work environment. The determination of a hostile work environment can only be made by evaluating all of the circumstances which include the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether it is an unreasonable interference with the victim's work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

Defendant argues that, as a matter of law, a single incident of harassment is insufficient to support a hostile work environment claim. Seventh Circuit caselaw demonstrates otherwise. The Seventh Circuit has stated that a single act can be sufficient to support a hostile work environment claim. *King v. Board of Regents,* 898 F.2d 533, 537 (7th Cir.1990). While it is true that in *King* the Seventh Circuit pointed out that "[a]lthough a single act can be enough, generally, repeated incidents create a stronger claim of hostile environment, with the strength of the claim depending on the number of incidents and the intensity of each incident," *id.,* the Seventh Circuit has specifically criticized the use of any bright line rule requiring a minimum number of incidents to support a hostile work environment claim as a matter of law.

The determination of defendant's liability "must be made on a case-by-case basis after considering the totality of the circumstances." *Nazaire,* 807 F.2d at 1380–1381. Within the totality of circumstances, there is neither a threshold "magic number" of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim. *Daniels,* 937 F.2d at 1273–1274. *Rodgers v. Western–Southern Life Ins. Co.,* 12 F.3d 668, 675 (7th Cir.1993). Consequently, the Court refuses to conclude that one incident is, as a matter of law, insufficient to support a hostile work environment claim.

That conclusion, coupled with the evidence that the incident at issue was especially severe, leads this Court to conclude that Plaintiff has submitted sufficient evidence to create a genuine issue of material fact as to the hostile work environment claim. Courts have pointed out that the racial epithet of "nigger" is particularly offensive. *See Rodgers,* 12 F.3d at 675. In *Rodgers,* the Seventh Circuit stated that the word "nigger" is unambiguously racist and held that its use on even a few occasions affects the terms and conditions of the plaintiff's employment severely enough to support a hostile work environment claim. *Id.* Other courts have also noted the severe impact of the use of the word. *See Bailey v. Binyon,* 583 F.Supp. 923, 927 (N.D.Ill.1984). "The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se." *Id.*

In addition, in the present case, it is undisputed that Vasilopulos not only used the word "nigger" in the exchange with Tutman but Vasilopulos also threatened to kill Tutman. This added physical threat makes the present case distinguishable from cases in which the Seventh Circuit has held that there was no hostile work environment as a matter of law. *See McKenzie v. Illinois Dep't of Transportation,* 92 F.3d 473, 480 (7th Cir.1996) (holding that three sexually suggestive comments over a three month period were not frequent enough nor severe enough to be unreasonable interference with the plaintiff's work environment); *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 885 (7th Cir.1998) (holding that a single offensive, racist comment was not sufficient to

establish a hostile work environment). Consequently, the Court concludes that the evidence submitted by Plaintiff creates a genuine issue of material fact as to whether the discriminatory conduct suffered by Plaintiff· was so offensive and severe that a single act of it creates a hostile work environment.[1]

## 2. Response to the Conduct

■ Even though Tutman was able to demonstrate that Vasilopulos's conduct created a racially hostile work environ- ment, CBS is entitled to summary judg- ment on Tutman's hostile work environ- ment claim because the record is clear that as a matter of law CBS took prompt and appropriate remedial action in response to Vasilopulos's conduct. An employer can be held responsible for a hostile work envi- ronment only if, when an employee haras- ses a coworker, the employer knew or had reason to know of the conduct and failed to take appropriate corrective action. *McKenzie*, 92 F.3d at 480. An employer acts unreasonably if the employer unduly

---

1. Plaintiff cited to several additional instances of discriminatory conduct at CBS which the court may properly consider in deciding the motion for summary judgment. The Court concludes that one set of these allegations adds support to Plaintiff's hostile work envi- ronment claim. Mr. Tutman testified as to general discriminatory treatment directed at minorities. (Pl.'s 12(N) Statement ¶ 16.) In addition, Mr. Tutman himself allegedly was the target of four or five physical threats. (Pl.'s 12(N) Statement ¶ 17. but cited pages not included in exhibits) Further, there was an additional incident with Vasilopulos in which he told an African–American producer to "get the fuck out of my office." (Pl.'s 12(N) Statement ¶ 23.) Finally, there were allegations of racial harassment being suf- fered by third parties at CBS including one employee being called a "spic" and another employee being told she was "too dark." (Pl.'s 12(N) Statement ¶ 15.)

First, the Court finds the allegations regard- ing general discriminatory treatment are in- sufficient to provide evidence of a hostile work environment in that Plaintiff has provid- ed no specific details regarding any particular instances of such treatment aside from a list of names and a brief, general description of an adverse action suffered by that person. The Court cannot make any informed assess- ment as to the severity, frequency, or perva- siveness of these incidents with only these general allegations. It would not even be possible to conclude from these general alle- gations whether the conduct was actually dis- criminatory as compared to, for instance, ra- cial slurs which are discriminatory on their face. It is not the Court's place to hold a mini-trial on each one of these incidents. Consequently, this allegation cannot provide the basis for a hostile work environment claim.

Second, regarding the allegations that Tut- man himself suffered four or five physical threats, Plaintiff failed to provide details as to the specific instances of threatening conduct nor facts to support the allegation that these were motivated by discrimination. In fact, aside from including these allegations in his statement of facts, Plaintiff did not even in- clude the deposition pages in his exhibit to which he cited. The Court will not presume, without any evidence, that these incidents were discriminatory; thus, the allegations of physical threats provide no evidence to sup- port Tutman's hostile work environment claim.

Finally, as to the racial slurs directed at other employees at CBS and the profanity Vasilopulos directed at an African–American producer, the Court will consider these based on Northern District of Illinois and Seventh Circuit precedents demonstrating that it is permissible for a court to consider harass- ment of third parties in hostile work environ- ment claims. *See Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 460 (7th Cir. 1990) (considering corroborating evidence as to instances of harassment of other employ- ees); *Valadez v. Uncle Julio's of Illinois, Inc.*, 895 F.Supp. 1008, 1013 (N.D.Ill.1995) (stat- ing that "the court can consider evidence of sexual harassment directed at other employ- ees of the same sex as plaintiff" when deter- mining the existence of a hostile work envi- ronment). Consequently, the racial slurs and profanity directed at other minority employ- ees can be considered in the hostile work environment claim. However, even com- bined with the threat towards Tutman, Tut- man has still only provided evidence of four isolated incidents of racial discrimination at CBS. While there is a question as to when Tutman learned of these incidents, these in- stances do have the potential to provide add- ed corroboration of Plaintiff's claim of a hos- tile work environment. Consequently, this evidence further supports the Court's conclu- sion that there is a genuine issue of material fact as to Plaintiff's hostile work environment claim.

delays its response to an incident or if the action the employer does take is not reasonably likely to prevent the conduct from recurring. *Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 535 (7th Cir.1993).

### a. Appropriateness in General

Plaintiff argues that CBS's response was not appropriate because it did not conduct an adequate investigation. Plaintiff disputes whether there was an actual investigation and alleges that the so-called investigation was in actuality just a series of meetings. However, Plaintiff did not dispute a single paragraph in CBS's statement of facts describing the investigation. (Pl.'s 12(N) Response ¶¶ 35–65.) The investigation included multiple interviews with Vasilopulos, (Def.'s 12(M) ¶¶ 40, 51, 59), interviews with Tutman, (Def.'s 12(M) ¶¶ 44, 59), and interviews with employees who had witnessed the incident, (Def.'s 12(M) ¶ 59). The investigation also included inquiries into the incident by three different individuals, the News Director, the General Manager, and a representative from the New York Human Resources Department. (Def.'s 12(M) ¶¶ 39, 40, 51, 58.) In addition, Plaintiff cites no cases to support his position that this was an inadequate investigation. Consequently, the Court concludes that the investigation was sufficient as a matter of law.

Plaintiff also argues that CBS's response was not appropriate because CBS's policy required that Vasilopulos be terminated. Plaintiff argues that CBS did not have discretion under its policy on how to discipline Vasilopulos. This argument is rejected because the policy on its face provides CBS with discretion. The policy states that

> CBS will not tolerate any form of harassment on account of race, color, national origin, religion, sex, age, sexual orientation.... The Company will investigate any issue as it arises and will take appropriate action. Any employee who engages in such harassment will be sub-

ject to discipline, *up to and including termination.*

(Pl.'s Ex. 5, CBS Policy, General, Fair Employment Practices) (emphasis added).

> The following categories are examples of conduct which *may* be grounds for immediate discharge.... Each situation is to be judged on a case-by-case basis....
>
> *Misconduct*
>
> Conduct which is adverse to the safety and welfare of CBS or its employees, including, but not limited to, any act of violence to property or person .... or any behavior, which in the sole discretion of CBS, endangers CBS' employees, premises, or property or presents a threat of such danger....

(Pl.'s Ex. 5, CBS Policy, Discipline and Termination) (emphasis added). First, under the policy, harassment does not require immediate termination only discipline, "up to and including termination." Second, the Discipline and Termination section does not mandate termination for the listed categories but only says that it *may* be the result. Third, even if the Discipline and Termination section did require termination, the conduct at issue does not necessarily fall into the *Misconduct* category within the Discipline and Termination section. The conduct at issue could be interpreted one of two ways: (1) Vasilopulos was serious and intended his words to be a threat to kill Tutman or (2) Vasilopulos was merely joking around and never genuinely intended to kill Tutman or for his words to be interpreted as a serious threat to kill Tutman. Consequently, it was open for interpretation as to whether Vasilopulos's conduct was a genuine threat of violence which fell within the *Misconduct* category. After investigation, CBS concluded that it did not. It was within CBS's discretion to draw that conclusion.

Seventh Circuit case law reinforces the conclusion that CBS's response was appropriate. In *McKenzie v. Illinois Dep't of Transportation,* 92 F.3d 473, 483 (7th Cir. 1996), the employer's response to an em-

ployee's sexually suggestive remarks to the plaintiff consisted of having a meeting to discuss the complaint, deciding that the employee would have no further contact with the plaintiff, and issuing a memo reiterating the company's sexual harassment policy. *Id.* The Court held that, as a matter of law, the response was a reasonable one given the gravity of the conduct. *Id.* In *Iovin v. Northwestern Memorial Hospital*, 916 F.Supp. 1395, 1411 (N.D.Ill. 1996), the employer's response to discriminatory remarks made to the plaintiff consisted of telling the plaintiff that such remarks would not be tolerated, meeting with the offender and warning him that the conduct was inappropriate and must cease immediately, issuing a written warning to the offender which detailed the employer's anti-discrimination policy, and finally moving the plaintiff's workstation away from the offender's. *Id.* The court held that, as a matter of law, this was an appropriate response. *Id.*

█ CBS's response to the harassment at issue in the present case went farther than the response in either *Iovin or McKenzie*. Not only did CBS issue a warning letter to the wrongdoer as did the employer in *Iovin*, assure that the plaintiff and the wrongdoer would have no further contact as did both the employers in *Iovin* and *McKenzie*, and recirculate its antidiscrimination policy as did the employer in *McKenzie*, but CBS also sent the wrongdoer to a training session. Thus, even though the gravity of the conduct in all of these cases was comparable, that is, consisting of discriminatory remarks, CBS response went beyond the responses in *McKenzie* and *Iovin*. Thus, based on these precedents, CBS's response in the present case was appropriate as a matter of law.

### b. Promptness

The Court must also examine whether CBS's response was sufficiently prompt after Tutman complained of Vasilopulos's conduct. The Court concludes that no question of fact exists on this issue. CBS's response consisted of the following actions within the following time frames. First, after Tutman reported the incident to his supervisor, his supervisor immediately reported it to the News Director. (Def.'s 12(M) ¶ 38.) The News Director began his investigation the very day of the incident. (Def.'s 12(M) ¶¶ 39–40.) The next business day, Tutman reported the incident to the General Manager of the station, who began his own investigation. (Def.'s 12(M) ¶¶ 51–52.) Four days after the incident, the Director of Policy and Administration from the human resources department traveled from New York to also conduct an investigation independent of the others that were occurring. (Def.'s 12(M) ¶ 58.) Finally, before the close of two weeks, CBS had concluded its investigation and determined what course of action it would take in response to the incident. (Def.'s 12(M) ¶¶ 74–84.) Further, two out of three prongs of its response, the letter of reprimand to Vasilopulos and Vasilopulos's letter to Tutman, were also completed within two weeks of the incident, leaving only Vasilopulos's training to be completed. (Def.'s 12(M) ¶¶ 75, 84–86.)

█ Under the case law, an investigation and response within two week's time is sufficiently prompt. In *Saxton*, the court concluded as a matter of law that the employer acted with sufficiently promptness when the supervisor began his investigation the day after the plaintiff lodged her formal complaint, the supervisor completed his report two weeks later, and finally the wrongdoer was disciplined within five weeks of the incident. *Saxton*, 10 F.3d at 535. In *McKenzie* the Court held that, as a matter of law, an employer's response was prompt when management met to discuss the complaint and determine a course of response within ten days of the incident being reported. *McKenzie v. Illinois Dep't of Transportation*, 92 F.3d 473, 481 (7th Cir.1996). Consequently, the Court concludes that CBS's present action of investigating the incident, determining

its course of action, and reprimanding the offender within two weeks of the incident is sufficiently prompt.

### c. Reasonably Likely to Prevent the Conduct from Recurring

██ The Court also concludes as a matter of law that CBS's investigation and response to the incident was reasonably likely to prevent the conduct from recurring. First, when Tutman reported the incident to Jenkins, Simmons, and McGann, all verbally responded to Tutman in a way that demonstrated that they were taking the allegations seriously. (Def.'s 12(M) ¶¶ 26–27, 33, 47.) Jenkins told Tutman that he had done the right thing by informing her of the incident and assured him that she would take care of the matter. (Def.'s 12(M) ¶¶ 26–27.) Simmons told Tutman that he had done the right thing by reporting the incident. (Def.'s 12(M) ¶ 33.) Simmons also told Tutman that he would discuss the incident with Jenkins. (Def.'s 12(M) ¶ 34.) McGann told Tutman that he was taking the allegations very seriously and resolving the matter would be McGann's top priority. (Def.'s 12(M) ¶ 47.) Several members of CBS management also informed Vasilopulos that the allegations against him were very serious. (Def.'s 12(M) ¶¶ 41, 55.) Immediately after the incident, three different members of CBS management launched investigations into the occurrence. (Def.'s 12(M) ¶¶ 39–40, 51–52, 58.)

These investigations resulted in a conclusion that although Vasilopulos's behavior was inappropriate, it was not meant to be seriously threatening and Vasilopulos posed no risk of violence to Tutman. (Def.'s 12(M) ¶¶ 66–67.) As a result, there was a three pronged response to Vasilopulos which included a warning letter to Vasilopulos that was placed in his file, sending Vasilopulos to a workshop on workplace relationships, and the letter from Vasilopulos to Tutman. (Def.'s 12(M) ¶¶ 74–80.) CBS additionally took several other steps to prevent the occur-

rence of similar incidents. CBS put Tutman on paid leave until and even after the situation was resolved. (Def.'s 12(M) ¶ 89.) In addition, CBS recirculated its anti-discrimination policy to all employees at the station. (Def.'s 12(M) ¶ 87.) Finally, CBS saw to it that there would be no contact between Tutman and Vasilopulos by placing them on different shifts and allowing Tutman to get his assignments without coming into the station. (Def.'s 12(M) ¶ 96.) The Court concludes that this response was reasonably likely to prevent the conduct from recurring.

Plaintiff argues to the contrary. Plaintiff points out that Vasilopulos had prior written reprimands in his file for similar instances in which he raised his voice at other employees and used profanity. Plaintiff posits that the incident between Vasilopulos and Tutman demonstrates that written reprimands neither altered nor modified Vasilopulos's behavior. Consequently, Plaintiff argues that CBS's response to Vasilopulos's treatment of Tutman was not appropriate because CBS had prior notice that a written warning to Vasilopulos was insufficient to prevent such behavior from recurring. Plaintiff, however, misconstrues the standard which requires prevention of likelihood of recurrence.

First, CBS's duty, the requirement of an appropriate response, only requires that the employer insure that the conduct will not likely be repeated between the offender and the plaintiff. The likelihood of recurrence need only be against the initial victim. *See Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 535–36 (7th Cir.1993) (holding that transferring the offender to a different department from the plaintiff "was a sufficient safeguard against any recurrence of the harassment"). Thus, CBS did not need to insure that Vasilopulos never again made discriminatory or harassing remarks to any employee at CBS, but only that Vasilopulos did not make discriminatory remarks again to Tutman.

The mere existence of repeat occurrences directed at different victims does not make the discrimination suffered by Plaintiff actionable. "Title VII is not directed against unpleasantness per se but only ... against discrimination in the conditions of employment." *Carr v. Allison Gas Turbine Div., General Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994). It is true that termination would have prevented repeated discriminatory conduct by Vasilopulos directed at any victim. However, the Court is not a super human resources department. The Court is not here to second guess CBS's hiring and hiring decisions. Vasilopulos certainly does not appear to be a pleasant coworker. He has on more than one occasion treated his coworkers disrespectfully and rudely. However, it is not the Court's job to review every prior incident in Vasilopulos's file, only the conduct directed at Plaintiff. In sum, since CBS's response to the present incident was appropriate and designed to prevent repeat occurrences of discrimination directed at Tutman, it was within CBS's discretion as an employer to choose to retain Vasilopulos.

Second, and perhaps more important, even if the prior reprimand in Vasilopulos's file demonstrated that a written warning was insufficient to prevent repeat occurrences of discriminatory remarks directed at the same victim, CBS took further undisputed steps to insure that Vasilopulos and Tutman would never have to have contact with each other. CBS offered Tutman different shifts from Vasilopulos and the option of receiving his assignments by telephone so Tutman would not have to come into the station. This offer was perfectly sufficient to insure the prevention of repeated discriminatory conduct by Vasilopulos directed at Tutman. Consequently, CBS's response was designed to prevent Tutman from suffering repeated acts of discrimination by Vasilopulos. In sum, in that Tutman fails to provide any evidence demonstrating that CBS's response to Tutman's complaint was inadequate or inappropriate, Defendant's motion for summary judgment is granted.

## C. The Constructive Discharge Claim

 Finally, the Court recommends granting Defendant's motion for summary judgment on the constructive discharge claim. To maintain a claim for constructive discharge, a plaintiff must show that his working conditions were so intolerable because of unlawful discrimination, that a reasonable person would have been compelled to resign. *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 885 (7th Cir.1998). A constructive discharge claim requires the work environment to be an aggravating situation beyond ordinary discrimination. *Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996). In that Tutman failed to meet the high standard required for constructive discharge, *Drake,* 134 F.3d at 886, the Court grants Defendant's motion for summary judgment.

 This conclusion is dictated by *Saxton v. American Telephone & Telegraph Co.,* 10 F.3d 526, 535 (7th Cir.1993). In *Saxton,* much like the present case, the employee plaintiff brought a claim as a result of dissatisfaction with the employer's response to discrimination. *Id.* at 530, 535. "Nothing in the record indicates that [the defendant] treated [the plaintiff] so poorly that a reasonable employee in her position would have felt compelled to resign. To the contrary, the evidence suggests that [the defendant] went out of its way to ensure that [the plaintiff] was not placed in an uncomfortable or embarrassing position while the company investigated her complaint and took remedial measures." *Id.* at 537 "Whatever lingering dissatisfaction [the plaintiff] may have felt regarding the resolution of her complaint or her position at work, her situation cannot reasonably be described as intolerable." *Id.* The plaintiff's evidence did not "support an inference that [her] decision to abandon her job was effectively coerced by [the defendant's actions.]" *Id.* In sum, the

court acknowledged that when an employer takes reasonable steps to rectify harassment, the employer cannot be held liable for constructive discharge. *Id.* In that, in the present case, the Court concluded above that CBS took reasonable steps to respond to the incident to Vasilopulos the Court concludes that a reasonable person, in light of such a response, would not feel compelled to resign.

## IV. CONCLUSION

Plaintiff has not presented sufficient evidence to create a genuine issue of material fact as to his retaliation claim, his hostile work environment claim, or his constructive discharge claim. **As a result, the Court recommends that Defendant's motion for summary judgment be granted on all claims.**