Mary Pat McDONNELL and Thomas W. Boockmeier, Plaintiffs–Appellants,

v.

Henry G. CISNEROS, Secretary of Housing and Urban Development, Defendant–Appellee.

No. 95–1864.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1996.

Decided May 20, 1996.

David P. Schippers (argued), James M. Bailey, Schippers & Bailey, Chicago, IL, for Plaintiff-Appellant.

Thomas P. Walsh, Matthew D. Tanner (argued), Office of the U.S. Atty. Gen., Civ. Div., Chicago, IL, for Defendant-Appellee.

Before POSNER, C.J., and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

These two consolidated suits, brought under Title VII of the Civil Rights Act of 1964, charge sexual harassment by HUD, the plaintiffs' employer, and also retaliation for complaining about the alleged harassment. The district judge granted HUD's motion to dismiss for failure to state a claim, so we take as true (of course without vouching for) the facts alleged in the complaint, which are as follows. In July 1993 the Secretary of Housing and Urban Development received an anonymous letter accusing employees in HUD's Chicago office of job-related sexual misconduct. The particular targets of the accusation were plaintiff Boockmeier, HUD's Regional Inspector General for Investigations, and plaintiff McDonnell, the Assistant Regional Inspector General for Investigations and thus Boockmeier's subordinate. Among the lurid charges was that McDonnell was Boockmeier's "in-house sex slave," who provided sexual favors to him in exchange for more rapid promotion and other preferential treatment. The plaintiffs believe that the letter, and a follow-up letter that repeated the charges in the original letter, were the work of a disgruntled employee in HUD's Office of Inspector General who wanted to ruin both plaintiffs' careers.

After receiving the second letter, HUD began an investigation of the two plaintiffs. Because they were employed in the Inspector General's office, which would normally conduct such an investigation, HUD retained investigators from the Defense Department.

They interviewed the plaintiffs and other employees of the Inspector General's Office in a hostile and unprofessional manner, indicating to the persons they interviewed their personal belief that the plaintiffs were guilty of the charges made in the anonymous letters. The manner in which the investigation was conducted gave rise to even more lurid rumors, widely circulated within HUD, including rumors of incest and other sexual deviance on the part of Boockmeier and a rumor that Boockmeier was the true father of McDonnell's child. These rumors made the plaintiffs pariahs. Male employees of HUD shunned McDonnell, female employees Boockmeier.

The investigation was completed in November of 1993 and completely exonerated both plaintiffs. Nevertheless they were advised by their superiors not to travel together or meet behind closed doors alone, lest they encourage a "perception" of sexual activity. Both during and after the investigation the plaintiffs complained to their superiors about the manner in which it was being conducted and demanded an investigation to determine the identity of their anonymous denouncer. Their superiors did nothing. On November 29, several weeks after he had filed an informal complaint that the treatment by the investigators constituted a form of sexual harassment forbidden by Title VII, Boockmeier was reassigned to HUD's Washington office for 90 days, ostensibly to dilute any perception that he had a sexual relationship with McDonnell.

In March of the following year, after McDonnell had filed and refused to withdraw similar (but formal) complaints on her own behalf, Boockmeier was told that his reassignment to Washington was being made permanent as a punishment for his having failed to control his subordinate—that is, to get McDonnell to drop her complaints. This sequence is the basis of Boockmeier's claim of retaliation.

McDonnell also claims retaliation, and let us start there. She claims that management ostracized, disdained, and ridiculed her in retaliation for her having filed complaints. We do not doubt that anger, irritation, dirty looks, even the silent treatment, can cause distress and by doing so discourage complaints; and in other contexts even rather petty attempts at humiliation, if sufficient to deter the exercise of a right, have been held to be actionable as infringements of rights, for example the right of free speech. *Wallace v. Benware,* 67 F.3d 655, 663–64 (7th Cir.1995); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982); *Scott v. Flowers,* 910 F.2d 201, 204, 213 (5th Cir.1990); *Allen v. Scribner,* 812 F.2d 426, 434 n. 17 (9th Cir.), modified, 828 F.2d 1445 (1987). There is, however, a tension in the cases (including the cases of this court) with respect to whether more is required in a retaliation case under Title VII (or under any of the other federal employment discrimination statutes that are modeled on Title VII, such as the Age Discrimination in Employment Act), the more being something that can be described as a "materially adverse employment action." *Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir.1994); see also *Reed v. Shepard,* 939 F.2d 484, 493 (7th Cir.1991); *Wu v. Thomas,* 996 F.2d 271, 273–74 (11th Cir.1993); cf. *Nelson v. Upsala College,* 51 F.3d 383, 388–89 (3d Cir.1995). Other cases, notably *Passer v. American Chemical Soc'y,* 935 F.2d 322, 331 (D.C.Cir.1991), reject this limitation. See also *Edwards v. Board of Regents,* 2 F.3d 382 (11th Cir.1993). *Collins v. Illinois,* 830 F.2d 692, 702–04 (7th Cir.1987), another of our cases, straddles the divide, by defining the required adverse job action very broadly. For a helpful review of the case law, see *Boyd v. Brookstone Corp. of New Hampshire, Inc.,* 857 F.Supp. 1568 (S.D.Fla.1994).

No limiting language appears in Title VII's retaliation provision. 42 U.S.C. § 2000e–3(a). The language of "materially adverse employment action" that some courts employ in retaliation cases is a paraphrase of Title VII's basic prohibition against employment discrimination, found in 42 U.S.C. §§ 2000e–2(a)(1) and (2). Under these provisions, there is no actionable discrimination without something that can be described as an adverse employment action—"discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment," as subsection 2(a)(1) puts it, or "limit[ing], segregat[ing], or classify[ing] ... employees or applicants for employment in any way that would deprive or tend to

deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," as subsection 2(a)(2) puts it. The provision regarding retaliation may intentionally be broader, since it is obvious that effective retaliation against employment discrimination need not take the form of a job action. Shooting a person for filing a complaint of discrimination would be an effective method of retaliation, though, as *Nelson* points out, 51 F.3d at 388, the victim of the retaliation would have other, and more powerful, remedies than a suit under Title VII. This would be a reason for confining the provision to retaliation that takes the form of an adverse job action. How serious the adversity need be is a separate question, also difficult.

We need not try to sort out the tangle here. The complaint shows that there was no causal connection between McDonnell's filing of the complaints and the alleged retaliation against her, so it becomes irrelevant whether the retaliation reached the level of severity at which the statute is triggered. The allegedly retaliatory conduct was merely the continuation of the conduct giving rise to the complaints. The basis of the complaints was that in response to groundless charges of sexual misconduct HUD subjected McDonnell to ostracism, disdain, and ridicule and that these things continued after her formal exoneration. In other words, nothing changed when she filed her complaints. There was no ratcheting up of the harassment. Therefore the complaints could not have been the cause of the ostracism, disdain, and ridicule of which she complains in the retaliation count.

We can imagine an argument that these things would have petered out but for her complaints, which revitalized them. But the argument is not made. On the contrary, McDonnell's underlying claim of sexual harassment includes the entire course of humiliation that she was subjected to both before *and after* she complained of the harassment. The complaints' incremental effect on the amount or intensity of the humiliation to which she was subjected was by her own account zero.

Boockmeier has a solider retaliation claim, to which we shall return after addressing the underlying claim of sexual harassment. The two types of claim, harassment (or other employment discrimination) and retaliation for complaining about or opposing the harassment, are independent. It is improper to retaliate for the filing of a claim of violation of Title VII even if the claim does not have merit—provided it is not completely groundless. *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1457–58 (7th Cir.1994); *Rucker v. Higher Educational Aids Board*, 669 F.2d 1179, 1182 (7th Cir.1982). There is nothing wrong with disciplining an employee for filing frivolous complaints.

We do not consider the claims of sexual harassment in this case frivolous, although we agree that it was right to dismiss them. Title VII does not prohibit sexual harassment as such, but it does prohibit discrimination, on grounds of sex, in working conditions. When a female worker is sexually harassed by male coworkers or supervisors, the result is to make the workplace less bearable for her because she is a woman than it is for the men who work beside her and, being male, are not harassed. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405–2406, 91 L.Ed.2d 49 (1986); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995); *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir.1996); *DeAngelis v. El Paso Municipal Police Officers Ass'n*, 51 F.3d 591, 593 (5th Cir.1995); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir.1994). The harassment can be purely verbal. *Id.* at 1464; *Dey v. Colt Construction & Development Co.*, *supra*, 28 F.3d at 1456; *Wallace v. Texas Tech University*, 80 F.3d 1042, 1050 n. 9 (5th Cir.1996); *Burns v. McGregor Electronic Industries*, 989 F.2d 959, 965 (8th Cir.1993); *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir.1991). Unfounded accusations that a woman worker is a "whore," a siren, carrying on with her coworkers, a Circe, "sleeping her way to the top," and so forth are capable of making the workplace unbearable for the woman verbally so harassed, and since these are accusations based on the fact that she is a woman, they could constitute a

form of sexual harassment. *Winsor v. Hinckley Dodge, Inc., supra*, 79 F.3d at 1000; *Spain v. Gallegos*, 26 F.3d 439, 442 (3d Cir. 1994); *Jew v. University of Iowa*, 749 F.Supp. 946, 958 (S.D.Iowa 1990). By a further stretch of the concept a male supervisor for whom life is made unbearable by baseless accusations that he is extorting sexual favors from his subordinates could also be thought a victim of sexual harassment. Such accusations would be based on the fact that he was a man—that is, on the difference in sex between him and the persons he was accused of abusing.

■ Analysis is complicated by the fact that a difference in sex is not a necessary condition of sexual activity and hence (most courts think) of sexual harassment. There is plenty of homosexual activity these days (perhaps all days); some of it occurs in the workplace; and some involves the extorting of sexual favors by superiors, or other behaviors that when heterosexual expose employers to liability for sexual harassment in violation of Title VII's prohibition of sex discrimination. E.g., *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745 (4th Cir. 1996); *Morgan v. Massachusetts General Hospital*, 901 F.2d 186, 192 (1st Cir.1990). And then there is the specter of the perfectly bisexual harasser—a number 3 on the Kinsey Scale of sexual preference—who by definition is indifferent to the sex of his victims and so engages in sexual harassment without discriminating on the basis of sex. See *Barnes v. Costle*, 561 F.2d 983, 990 n. 55 (D.C.Cir.1977). With examples like these the government urges us to affirm the dismissal of the plaintiffs' claim of sexual harassment on the ground that, since the harassment was impartially directed against the male and the female accused of improper sexual activity, there was no discrimination on grounds of sex.

We do not find this class of arguments compelling, and are rather surprised to find the Department of Justice urging them. Although supported by dicta in some cases, *id.*; *Rowinsky v. Bryan Independent School District*, 80 F.3d 1006, 1016 (5th Cir.1996); *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620 (6th Cir.1986); *Henson v. City of Dundee*, 682 F.2d 897, 903–04 (11th Cir.1982),

such arguments interpret sex discrimination in too literal a fashion. Sexual harassment was brought under the aegis of Title VII's sex discrimination clause because it makes the workplace difficult for women on account of their sex. There is some homosexual harassment in the workplace and a little bit of sexual harassment of men by women, but these are relatively esoteric practices that do not detract seriously from the fact that sexual harassment is a source of substantial nonpecuniary costs to many working women. It would be exceedingly perverse if a male worker could buy his supervisors and his company immunity from Title VII liability by taking care to harass sexually an occasional male worker, though his preferred targets were female. See *Steiner v. Showboat Operating Co., supra*, 25 F.3d at 1464.

Although we conclude that a claim of sexual harassment might arise from verbal harassment of a pair of male and female employees falsely accused of sexual hanky-panky in derogation of their duty to their employer, we do not think it can do so in the circumstances detailed at such length in the complaint. The plaintiffs' employer received a complaint of job-related sexual misconduct by them. Although the complaint was anonymous, the plaintiffs do not argue that their employer was obliged or even entitled to ignore it. Employers who disregard charges of sex-related misconduct by their employees run a considerable risk of being sanctioned for having tolerated sexual harassment. It behooved HUD to investigate the charges against the plaintiffs, and since the plaintiffs were employed in the department's investigative arm the department had to turn to another department for investigators. For this reason and to preserve an appearance of impartiality, HUD had to give the bloodhounds a long leash. Police officers, FBI agents, and other persons engaged in the investigation of misconduct, whether criminal or civil, sometimes stray across the indistinct line that separates vigorous from abusive investigation. The Defense Department's investigators may have done so in this case. The question is whether an investigation of sexual harassment that exceeds the proper limits is itself a form of actionable sexual harassment.

The objections to such an extension of the concept of sexual harassment are both practical and doctrinal. The practical objection is that it places the employer on a razor's edge. A parallel concern figured in this court's and the Supreme Court's decision that state welfare workers, who can be liable under the Constitution for removing children from parental custody without good cause, should not also be liable under the Constitution for failing without good cause to remove children from parental custody. *DeShaney v. Winnebago County Dept. of Social Services*, 812 F.2d 298, 303 (7th Cir.1987), *aff'd*, 489 U.S. 189, 203, 109 S.Ct. 998, 1007, 103 L.Ed.2d 249 (1989). The employer who fails to investigate a charge of sexual misconduct will be liable under Title VII, should the charge turn out to be meritorious, for having failed to exercise due care to prevent sexual harassment. E.g., *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1011–12 (7th Cir. 1994); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir.1993); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199 (5th Cir.1992). But if, because the employer wants to demonstrate how seriously he takes such charges, the investigation oversteps the proper bounds, causing humiliation to the targets of the investigation, the employer will, under the interpretation of the law that the plaintiffs urge in this case, also be guilty of sexual harassment.

The law does sometimes place people on a razor's edge, where they face liability for doing either too much or too little. But here we are being asked to extend the law to bring about this result, and we are reluctant to do this. We are especially reluctant because Congress has made specific provision with respect to the legal remedies of victims of improper investigation by federal officers—which brings us to the doctrinal objection to the extension of accepted principles that the plaintiffs seek. If, as alleged, the investigators in this case told the people whom they were interviewing that the plaintiffs had engaged in job-related sexual misconduct, then, because the statement was false and defamatory, the investigators committed the tort of defamation, for which the plaintiffs could sue them. But the investigators would have a defense of qualified immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 275–78, 113 S.Ct. 2606, 2617–18, 125 L.Ed.2d 209 (1993); *Siegert v. Gilley*, 500 U.S. 226, 234, 111 S.Ct. 1789, 1794, 114 L.Ed.2d 277 (1991). Since the amendments to the Federal Tort Claims Act made by the Westfall Act, Pub.L. 100–694, in 1988, they would have something even better—a right, upon certification by the Attorney General that they were acting within the scope of their employment, to substitute the United States as the party defendant and the Tort Claims Act for whatever law might otherwise apply. 28 U.S.C. §§ 2679(b)(1), (c), (d)(4); see also Pub.L. 100–694, § 2. The United States is not liable under the Tort Claims Act for defamation by its employees. 28 U.S.C. § 2680(h). One effect of the Westfall Act is therefore to preclude our plaintiffs' potential defamation claim (which arose after the Act went into effect) against the Defense Department's investigators.

■ The plaintiffs' counsel pointed to the Federal Tort Claims Act's exclusion of defamation as a reason for wanting to shoehorn the investigators' misconduct into Title VII. The exclusion weakens rather than strengthens the plaintiffs' case. When Congress crafts particular remedies for particular wrongs, the presumption is that these are the exclusive remedies and that such limitations as they may embody are not to be circumvented by extending a more generally worded statute over the subject of the more specific one. E.g., *Seminole Tribe v. Florida*, —— U.S. ——, ——, 116 S.Ct. 1114, 1132, 134 L.Ed.2d 252 (1996); *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 14–15, 101 S.Ct. 2615, 2623–24, 69 L.Ed.2d 435 (1981). The Tort Claims Act makes specific provision for suits arising out of abuses by federal investigators in a proviso to 28 U.S.C. § 2680(h) that conspicuously omits defamation from the list of abuses that can impose liability on the United States under the Act. The plaintiffs are trying to use Title VII, which does not have any specific provision with regard to federal investigators, to amend the Tort Claims Act and circumvent the Westfall Act.

■ We turn to Boockmeier's claim of retaliation. The claim, or at least so much of

it as survives other objections, alleges retaliation for Boockmeier's failure to prevent McDonnell and others from filing complaints, rather than for filing his own complaints. Such a claim does not come within the scope of the retaliation provision of Title VII if interpreted literally. That provision merely forbids the employer to "discriminate against any individual … because he has made a charge … or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e–3(a). The reason for this wording, however, so far as we are able to discover (there is no pertinent legislative history), is that in the ordinary case an employer would have no reason to retaliate against someone who did *not* file a complaint, testify, etc. Generally one retaliates against someone because of something he did rather than because of something someone else did. Not always. There is such a thing as collective punishment. But that possibility is unlikely to have been in the forefront of congressional thinking when the retaliation provision was drafted.

There are two situations, apparently not foreseen by Congress, in which a literal interpretation of the provision would leave a gaping hole in the protection of complainants and witnesses. The first situation, related to our point about collective punishment, is where the employer either does not know who the complainant is and decides therefore to retaliate against a group of workers that he knows includes the complainant, or makes a mistake and retaliates against the wrong person. The second situation, which is this case, is where the employer retaliates against an employee for having failed to prevent the filing of a complaint. Both are cases of genuine retaliation, and we cannot think of any reason (and the government has suggested none), other than pure oversight, why Congress should have excluded them from the protection of section 2000e–3(a). It does no great violence to the statutory language to construe "he has made a charge" to include "he was suspected of having made a charge" and "he allowed a charge to be made." *Wu v. Thomas*, 863 F.2d 1543, 1547–48 (11th Cir.1989), goes even further in liberally interpreting section 2000e–3(a) to accomplish its evident purpose, and no case is contrary.

The same provision, moreover, forbids retaliating against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. Several courts, including our own, hold that assisting another employee with his (in this case her) discrimination claim, as well as other endeavors to obtain the employer's compliance with Title VII, is protected "opposition conduct." We said in *Rucker v. Higher Educational Aids Bd., supra*, 669 F.2d at 1182, that "an *a fortiori* violation of section 2000e–3(a) is committed when an employee opposes an attempt to discriminate against a fellow employee so successfully that the employer desists from the attempt and then fires the 'whistle-blower' for what he has done." See also *EEOC v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir.1993); *Parker v. Baltimore & Ohio R.R.*, 652 F.2d 1012, 1019 (D.C.Cir.1981); *Novotny v. Great American Fed. Savings & Loan Ass'n*, 584 F.2d 1235, 1260–61 (3d Cir. 1978). It is true that these are cases of active opposition. Boockmeier's "opposition" was passive. It consisted only of failing to carry out his employer's desire that he prevent his subordinates from filing discrimination complaints. Passive resistance is a time-honored form of opposition, however, and it would be very odd to suppose that Congress meant a form of behavior that straddles what the cases, characterizing the dual structure of the retaliation provision, call "opposition" and "participation" conduct to fall between the stools. The result would be that employers could obtain immunity from the retaliation statute by directing their subordinates to take steps to prevent other workers (as by threat of dismissal or other discipline) from complaining about discrimination.

The complaint does not spell out the measures that Boockmeier was expected to take to prevent McDonnell from complaining, but such specificity is not required in a complaint. As McDonnell's direct superior, Boockmeier undoubtedly could harm her career—as *his* superiors must have known. And there is little doubt that the chain of retaliations would be adverse job actions—if the retaliations forbidden by Title VII are, to recur to an earlier discussion, so limited.

Also, the defendant does not argue that Boockmeier's punitive reassignment was not an adverse job action.

We believe that it was an error to dismiss the part of Boockmeier's complaint that charges retaliation. With this exception, the judgment is affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.