**Elaine HARRIS, Plaintiff–Appellant,**

v.

**John ASHCROFT, Defendant–Appellee.**

No. 02–2821.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 2003.

Decided Aug. 29, 2003.

Roma J. Stewart, Chicago, IL, for Plaintiff–Appellant.

James P. Fieweger, Office of the United States Attorney, Chicago, IL, for Defendants–Appellees.

Before POSNER, DIANE P. WOOD, and WILLIAMS, Circuit Judges.

## ORDER

Elaine Harris, an African–American woman, appeals from the grant of summary judgment for her former employer, the Drug Enforcement Administration, on her claims that the DEA forced her to leave her job because of her race and sex and retaliated against for engaging in activity protected by Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e–2, 2000e–3. Because Harris has not raised a genuine issue whether she suffered an adverse action, either in the form of a constructive discharge or a hostile work environment, we affirm.

## I. BACKGROUND

Harris started at the DEA in 1979 as a criminal investigator and over the next fifteen years received several promotions. She moved from the DEA's Chicago office to its office in New York and from there to the agency's Virginia headquarters. Then in June 1994, Harris was selected to head up the DEA's Hammond, Indiana, office as its "Resident Agent in Charge"–a position that she retained when the Hammond office moved to Merrillville, Indiana, two years later.

Harris left the DEA after a series of unfortunate events that occurred shortly after the move from Hammond to Merrillville. First, one of Harris's colleagues committed suicide, and after another agent threatened to take his own life, members of the office blamed Harris, who understandably became upset. Feeling ill and barely able to pull herself out of bed, Harris went on sick leave and in October 1996 saw Dr. Fred Levin, a Chicago psychiatrist. After diagnosing depression and posttraumatic stress disorder, Dr. Levin administered psychotherapy and drugs (including Xanax and Prozac) and told the DEA that Harris would not return to work until January 1997.

Harris returned as scheduled on January 13 but got off to a rocky start. On her first day back, she felt sick all day, and three days later she had an argument with her immediate supervisor. Administrative hangups worsened the situation. Because Harris had taken psychiatric leave, DEA policy required an independent medical review of her records before she could return to work. In addition, the DEA's chief medical officer wanted to know from Dr. Levin whether Harris still possessed sound judgment, could safely handle a firearm, or planned to take any medications upon returning. While these issues remained unresolved, the head of the DEA's

district office in Chicago, Joseph Vanacora, placed Harris on "limited duty"–meaning that she could no longer make operational decisions or carry a weapon.

Although her responsibilities had been temporarily reduced, agency officials provided Harris with opportunities to work. When Vanacora placed Harris on limited duty, he suggested that she catchup on paperwork in the Chicago office until she was cleared for active duty. And when Retha Fulmore, a personnel specialist, learned that Harris was interested in transferring to DEA headquarters in Virginia, she told Harris that although the agency would not grant a temporary transfer, she could apply for a vacant position in Virginia or request a medical-hardship reassignment there.

Harris did not accept Vanacora's offer to work in Chicago, explaining that after being relieved of her responsibilities in Merrillville, working in Chicago would only embarrass and humiliate her further. Nor did she request reassignment or apply to transfer to Virginia. Harris instead worked from home for a few days and on February 7 telephoned Fulmore to find out how long the independent medical review of her case would take. Fulmore responded that she did not know, and Harris, who by this point had exhausted her sick and annual leave, began taking leave without pay.

Harris continued without pay for six weeks and on March 17 resigned as head of the Merrillville office. According to Harris, she resigned because a few days earlier Vanacora had told her that she had not been cleared for active duty and that he needed to fill her position. Harris then requested emergency medical leave as well as 744 hours of donated leave from the Department of Justice's voluntary leave bank. Although Dr. Levin supported the application, explaining that he thought it would take Harris between five and twelve months to deal with her psychiatric emergency, Harris received only 160 hours of donated leave and was told to apply for additional time if that amount proved insufficient.

Meanwhile, the director of the DEA's employee-assistance program, Yvonne Conner, began helping Harris prepare an application for workers' compensation benefits. Conner also believed that Harris should apply for disability retirement and in May sent her a retirement application, which Harris ignored. Undeterred, Conner sent a second package two months later that contained a completed application, a self-addressed envelope, and instructions to return the package by Federal Express. According to Harris, she signed and returned the forms because she thought that "some kind of adverse action" was afoot and that she had no choice but to retire.

Harris's retirement application was granted in December 1997. In the meantime she completed two fruitless rounds of EEO counseling and then brought this action. She alleged in her amended complaint that DEA officials had discriminated against her because of her race and sex first by forcing her to resign as head of the Merrillville office and then by orchestrating her retirement from the agency entirely. Harris also claimed that she had been retaliated against because of her membership on the "Segar Committee"–a body established to monitor compliance with a court order issued in a racial discrimination suit filed against the DEA in 1981. On the DEA's motion the district court entered summary judgment against Harris, concluding that she had not raised a genuine issue whether an adverse employment action occurred.

## II. ANALYSIS

Because Harris resigned as head of the Merrillville office and then retired from the DEA, the district court rightly observed that she did not suffer a traditional adverse employment action, such as being demoted, fired, or passed over for a promotion. An adverse action is essential for both claims of discrimination and retaliation, *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 899–902 (7th Cir.2003)–though in retaliation cases the adverse action need not affect the terms or conditions of employment, *see, e.g., McDonnell v. Cisneros*, 84 F.3d 256, 258–59 (7th Cir. 1996) (explaining that shooting someone for engaging in activities protected by Title VII would be actionable retaliation). This subtlety is irrelevant here, however, because Harris identifies only two forms of adverse action, both of which affected her job. She first says that she was constructively discharged; alternatively, she argues that she was subjected to a hostile work environment. We consider these contentions in turn.

### A. Constructive Discharge

■ Like actual discharges, constructive discharges count as adverse actions. The difference is that constructive discharges occur when employees, not employers, formally alter the employment relationship. Commonly employees cut their ties because of intolerable working conditions, *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744–45 (7th Cir.2002), but constructive discharges also occur when employers simply make it clear to reasonable employees that they will be fired if they do not quit, *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir.2002) (collecting cases).

Harris insists that she faced the dilemma of either quitting or waiting around to be fired in two ways. She first contends that she was forced to resign from her position in Merrillville after Vanacora told her that she was not cleared to return to work and that he was going to have to fill her position with someone else. Because Harris did not leave the DEA at this time, she technically does not allege constructive *discharge;* really she is asserting a constructive *demotion. See Simpson v. Borg–Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir.1999) (recognizing such a theory). But whatever the characterization, the argument is unavailing.

Even if Vanacora told Harris that he needed to fill her position (Harris's affidavit provides the only evidence on this point), both he and Fulmore offered alternative assignments while she was on limited duty. Vanacora told Harris that she could work in the Chicago office until she was cleared to return to active duty, and Fulmore recommended applying for reassignment or a transfer to DEA headquarters. Harris does not explain how these options were inferior to remaining in Merrilliville on limited-duty status, which makes it impossible to say that the DEA gave her no choice but to resign. *See EEOC. v. Sears, Roebuck & Co.*, 233 F.3d 432, 441 (7th Cir.2000); *Perry v. Harris Chernin, Inc.* 126 F.3d 1010, 1015 (7th Cir.1997).

Harris also contends that the DEA made it clear that she was about to be fired when Conner sent her a completed retirement package and instructed her to return it by Federal Express. Encouraging an employee to retire can amount to an adverse employment action, but as with other constructive discharges, there must be evidence that a reasonable employee would not feel free to ignore the suggestion. *See, e.g., Brown v. Ameritech Corp.*, 128 F.3d 605, 608 (7th Cir.1997); *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1128 (6th Cir.1998). As we explained

in *Henn v. National Geographic Society,* 819 F.2d 824 (7th Cir.1987), an age discrimination case, a meaningful choice may not exist where employees do not know the consequences of rejecting an offer to retire, have no chance to say no, or cannot be expected to make an intelligent choice because of fraud or other misconduct. *Id.* at 828–29; *see also Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 480 (1st Cir.1993).

Given these principles, it is plain that Harris was not forced into involuntary retirment. Harris says that she signed the retirement papers because she suspected "some kind of adverse action" if she refused, and she emphasizes that Conner filled the forms out in advance and instructed her to return them by Federal Express. But nothing in the record supplies a basis for Harris's fear that she would be worse off if she did not sign. And even if Conner's request to use Federal Express implied that Harris needed to act quickly, *Henn* holds that retirement is not involuntary just because time pressure necessitates prompt action. 819 F.2d at 828.

## B.   Hostile Work Environment

■   Harris also argues that she suffered an adverse action in the form of a hostile work environment. A hostile work environment is a change in the conditions of employment that arises in a subjectively and objectively abusive workplace. *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998); *Meritor Savings Bank, F.S.B. v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Harris identifies a host of incidents that she says establish a hostile work environment. She complains that one of her coworkers blamed her for the suicidal threats of a colleague, that her

immediate supervisor screamed at her just three days after she returned from medical leave, that agency officials gave her the runaround by demanding independent medical review of her records before she returned to work (a review that may never have occurred), that the agency refused to provide her with donated leave, and that even before her medical leave she endured years of efforts by her supervisors to "undermine her authority" and "remove her from her position."

There are a number of reasons why this list of grievances does not add up to a hostile work environment. First, some of the alleged events occurred more than 45 days before Harris sought EEO counseling, which ordinarily would mean that they are not actionable. 29 C.F.R. § 1614.105(a). There is an exception where the discriminatory event is a hostile work environment, *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115–121, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), yet even if the exception applied, Harris's evidence is insufficient.

The problem is that while no doubt hurtful (particularly to someone battling depression), the events cited by Harris have no obvious relationship to her race or sex or (with respect to her retaliation claim) her membership on the Segar Committee. Blaming Harris for the suicidal condition of a coworker on the heels of another colleague's actual suicide was horribly cruel; yelling at her three days after she returned from medical leave likewise was insensitive. But incivility by itself is not prohibited by Title VII, *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), and to prevail on a hostile-work-environment claim there must be some evidence tying the harassment to the plaintiff's membership

in a protected class, *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir.2002) (discrimination); *Knox v. Indiana*, 93 F.3d 1327, 1334–35 (7th Cir. 1996) (retaliation). Harris has not made the necessary connection here, making summary judgment for the DEA proper.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.