(Slip Opinion)        OCTOBER TERM, 2008        1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CRAWFORD *v.* METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 06–1595.  Argued October 8, 2008—Decided January 26, 2009

In response to questions from an official of respondent local government (Metro) during an internal investigation into rumors of sexual harassment by the Metro School District employee relations director (Hughes), petitioner Crawford, a 30-year employee, reported that Hughes had sexually harassed her.  Metro took no action against Hughes, but soon fired Crawford, alleging embezzlement.  She filed suit under Title VII of the Civil Rights Act of 1964, claiming that Metro was retaliating for her report of Hughes's behavior, in violation of 42 U. S. C. §2000e–3(a), which makes it unlawful "for an employer to discriminate against any . . . employe[e]" who (1) "has opposed any practice made an unlawful employment practice by this subchapter" (opposition clause), or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (participation clause).  The court granted Metro summary judgment, and the Sixth Circuit affirmed, holding that the opposition clause demanded "active, consistent" opposing activities, whereas Crawford had not initiated any complaint prior to the investigation, and finding that the participation clause did not cover Metro's internal investigation because it was not conducted pursuant to a Title VII charge pending with the Equal Employment Opportunity Commission.

*Held:* The antiretaliation provision's protection extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation. Because "oppose" is undefined by statute, it carries its ordinary dictionary meaning of resisting or contending against.  Crawford's statement is thus covered by the opposition clause, as an ostensibly

2      CRAWFORD *v.* METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON CTY.

Syllabus

disapproving account of Hughes's sexually obnoxious behavior toward
her. "Oppose" goes beyond "active, consistent" behavior in ordinary
discourse, and may be used to speak of someone who has taken no ac-
tion at all to advance a position beyond disclosing it. Thus, a person
can "oppose" by responding to someone else's questions just as surely
as by provoking the discussion. Nothing in the statute requires a
freakish rule protecting an employee who reports discrimination on
her own initiative but not one who reports the same discrimination in
the same words when asked a question. Metro unconvincingly ar-
gues for the Sixth Circuit's active, consistent opposition rule, claim-
ing that employers will be less likely to raise questions about possible
discrimination if a retaliation charge is easy to raise when things go
badly for an employee who responded to enquiries. Employers, how-
ever, have a strong inducement to ferret out and put a stop to dis-
criminatory activity in their operations because *Burlington Indus-
tries, Inc.* v. *Ellerth*, 524 U. S. 742, 765, and *Faragher* v. *Boca Raton*,
524 U. S. 775, 807, hold "[a]n employer . . . subject to vicarious liabil-
ity to a victimized employee for an actionable hostile environment
created by a supervisor with . . . authority over the employee." The
Circuit's rule could undermine the *Ellerth-Faragher* scheme, along
with the statute's " 'primary objective' " of "avoid[ing] harm" to em-
ployees, *Faragher*, *supra,* at 806, for if an employee reporting dis-
crimination in answer to an employer's questions could be penalized
with no remedy, prudent employees would have a good reason to keep
quiet about Title VII offenses. Because Crawford's conduct is covered
by the opposition clause, this Court does not reach her argument that
the Sixth Circuit also misread the participation clause. Metro's other
defenses to the retaliation claim were never reached by the District
Court, and thus remain open on remand. Pp. 3–8.

211 Fed. Appx. 373, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and STEVENS, SCALIA, KENNEDY, GINSBURG, and BREYER, JJ.,
joined. ALITO, J., filed an opinion concurring in the judgment, in which
THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–1595

_____

## VICKY S. CRAWFORD, PETITIONER *v.* METRO-POLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 26, 2009]

JUSTICE SOUTER delivered the opinion of the Court.

Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §2000e *et seq.* (2000 ed. and Supp. V), forbids retaliation by employers against employees who report workplace race or gender discrimination. The question here is whether this protection extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation. We hold that it does.

I

In 2002, respondent Metropolitan Government of Nashville and Davidson County, Tennessee (Metro), began looking into rumors of sexual harassment by the Metro School District's employee relations director, Gene Hughes.[1]  211 Fed. Appx. 373, 374 (CA6 2006).  When

_____

[1] Because this case arises out of the District Court's grant of summary judgment for Metro, "we are required to view all facts and draw all reasonable inferences in favor of the nonmoving party, [Crawford]." *Brosseau* v. *Haugen*, 543 U. S. 194, 195, n. 2 (2004) *(per curiam).*

2 CRAWFORD *v.* METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON CTY.

Opinion of the Court

Veronica Frazier, a Metro human resources officer, asked petitioner Vicky Crawford, a 30-year Metro employee, whether she had witnessed "inappropriate behavior" on the part of Hughes, *id.*, at 374–375, Crawford described several instances of sexually harassing behavior: once, Hughes had answered her greeting, "'Hey Dr. Hughes, what's up?,'" by grabbing his crotch and saying "'[Y]ou know what's up'"; he had repeatedly "'put his crotch up to [her] window'"; and on one occasion he had entered her office and "'grabbed her head and pulled it to his crotch,'" *id.*, at 375, and n. 1. Two other employees also reported being sexually harassed by Hughes. *Id.*, at 375. Although Metro took no action against Hughes, it did fire Crawford and the two other accusers soon after finishing the investigation, saying in Crawford's case that it was for embezzlement. *Ibid.* Crawford claimed Metro was retaliating for her report of Hughes's behavior and filed a charge of a Title VII violation with the Equal Employment Opportunity Commission (EEOC), followed by this suit in the United States District Court for the Middle District of Tennessee. *Ibid.*

The Title VII antiretaliation provision has two clauses, making it "an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U. S. C. §2000e–3(a). The one is known as the "opposition clause," the other as the "participation clause," and Crawford accused Metro of violating both.

The District Court granted summary judgment for Metro. It held that Crawford could not satisfy the opposition clause because she had not "instigated or initiated any complaint," but had "merely answered questions by

investigators in an already-pending internal investigation, initiated by someone else." Memorandum Opinion, No. 3:03–cv–00996 (MD Tenn., Jan. 6, 2005), App. C to Pet. for Cert. 16a–17a. It concluded that her claim also failed under the participation clause, which Sixth Circuit precedent confined to protecting "'an employee's participation in an employer's internal investigation . . . where that investigation occurs pursuant to a pending EEOC charge'" (not the case here). *Id.*, at 15a (emphasis omitted) (quoting *Abbott* v. *Crown Motor Co.*, 348 F. 3d 537, 543 (CA6 2003)).

The Court of Appeals affirmed on the same grounds, holding that the opposition clause "'demands active, consistent "opposing" activities to warrant . . . protection against retaliation,'" 211 Fed. Appx., at 376 (quoting *Bell* v. *Safety Grooving & Grinding, LP*, 107 Fed. Appx. 607, 610 (CA6 2004)), whereas Crawford did "not claim to have instigated or initiated any complaint prior to her participation in the investigation, nor did she take any further action following the investigation and prior to her firing." 211 Fed. Appx., at 376. Again like the trial judge, the Court of Appeals understood that Crawford could show no violation of the participation clause because her "'employer's internal investigation'" was not conducted "'pursuant to a pending EEOC charge.'" *Ibid.* (quoting *Abbott*, *supra,* at 543).

Because the Sixth Circuit's decision conflicts with those of other Circuits, particularly as to the opposition clause, see, *e.g.*, *McDonnell* v. *Cisneros*, 84 F. 3d 256, 262 (CA7 1996), we granted Crawford's petition for certiorari. 552 U. S. ___ (2008). We now reverse and remand for further proceedings.

## II

The opposition clause makes it "unlawful . . . for an employer to discriminate against any . . . employe[e] . . .

4    CRAWFORD *v.* METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON CTY.

Opinion of the Court

because he has opposed any practice made . . . unlawful
. . . by this subchapter." §2000e–3(a). The term "oppose,"
being left undefined by the statute, carries its ordinary
meaning, *Perrin* v. *United States*, 444 U. S. 37, 42 (1979):
"to resist or antagonize . . . ; to contend against; to con-
front; resist; withstand," Webster's New International
Dictionary 1710 (2d ed. 1958). Although these actions
entail varying expenditures of energy, "RESIST frequently
implies more active striving than OPPOSE." *Ibid.;* see also
Random House Dictionary of the English Language 1359
(2d ed. 1987) (defining "oppose" as "to be hostile or adverse
to, as in opinion").

The statement Crawford says she gave to Frazier is thus
covered by the opposition clause, as an ostensibly disap-
proving account of sexually obnoxious behavior toward her
by a fellow employee, an answer she says antagonized her
employer to the point of sacking her on a false pretense.
Crawford's description of the louche goings-on would
certainly qualify in the minds of reasonable jurors as
"resist[ant]" or "antagoni[stic]" to Hughes's treatment, if
for no other reason than the point argued by the Govern-
ment and explained by an EEOC guideline: "When an
employee communicates to her employer a belief that the
employer has engaged in . . . a form of employment dis-
crimination, that communication" virtually always "consti-
tutes the employee's *opposition* to the activity." Brief for
United States as *Amicus Curiae* 9 (citing 2 EEOC Compli-
ance Manual §§8–II–B(1), (2), p. 614:0003 (Mar. 2003));
see also *Federal Express Corp.* v. *Holowecki*, 552 U. S. ___,
___ (2008) (slip op., at 8) (explaining that EEOC compli-
ance manuals "reflect 'a body of experience and informed
judgment to which courts and litigants may properly
resort for guidance'" (quoting *Bragdon* v. *Abbott*, 524 U. S.
624, 642 (1998))). It is true that one can imagine excep-
tions, like an employee's description of a supervisor's
racist joke as hilarious, but these will be eccentric cases,

and this is not one of them.[2]

The Sixth Circuit thought answering questions fell short of opposition, taking the view that the clause "'demands active, consistent "opposing" activities to warrant . . . protection against retaliation,'" 211 Fed. Appx., at 376 (quoting *Bell*, *supra,* at 610), and that an employee must "instigat[e] or initiat[e]" a complaint to be covered, 211 Fed. Appx., at 376. But though these requirements obviously exemplify opposition as commonly understood, they are not limits of it.

"Oppose" goes beyond "active, consistent" behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. Countless people were known to "oppose" slavery before Emancipation, or are said to "oppose" capital punishment today, without writing public letters, taking to the streets, or resisting the government. And we would call it "opposition" if an employee took a stand against an employer's discriminatory practices not by "instigating" action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons. Cf. *McDonnell, supra,* at 262 (finding employee covered by Title VII of the Civil Rights Act of 1964 where his employer retaliated against him for failing to prevent his subordinate from filing an EEOC charge). There is, then, no reason to doubt that a person can "oppose" by responding to someone else's

---

[2] Metro suggests in passing that it was unclear whether Crawford actually opposed Hughes's behavior because some of her defensive responses were "inappropriate," such as telling Hughes to "bite me" and "flip[ping] him a bird." Brief for Respondent 1–2 (internal quotation marks omitted). This argument fails not only because at the summary judgment stage we must "view all facts and draw all reasonable inferences in [Crawford's] favor," *Brosseau*, 543 U. S., at 195, n. 2, but also because Crawford gave no indication that Hughes's gross clowning was anything but offensive to her.

6    CRAWFORD *v.* METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON CTY.

Opinion of the Court

question just as surely as by provoking the discussion, and
nothing in the statute requires a freakish rule protecting
an employee who reports discrimination on her own initia-
tive but not one who reports the same discrimination in
the same words when her boss asks a question.

Metro and its *amici* support the Circuit panel's insis-
tence on "active" and "consistent" opposition by arguing
that the lower the bar for retaliation claims, the less likely
it is that employers will look into what may be happening
outside the executive suite. As they see it, if retaliation
is an easy charge when things go bad for an employee
who responded to enquiries, employers will avoid the
headache by refusing to raise questions about possible
discrimination.

The argument is unconvincing, for we think it underes-
timates the incentive to enquire that follows from our
decisions in *Burlington Industries, Inc.* v. *Ellerth*, 524
U. S. 742 (1998), and *Faragher* v. *Boca Raton*, 524 U. S.
775 (1998). *Ellerth* and *Faragher* hold "[a]n employer . . .
subject to vicarious liability to a victimized employee for
an actionable hostile environment created by a supervisor
with . . . authority over the employee." *Ellerth*, *supra,* at
765; *Faragher*, *supra,* at 807. Although there is no af-
firmative defense if the hostile environment "culminates
in a tangible employment action" against the employee,
*Ellerth*, 524 U. S., at 765, an employer does have a defense
"[w]hen no tangible employment action is taken" if it
"exercised reasonable care to prevent and correct promptly
any" discriminatory conduct and "the plaintiff employee
unreasonably failed to take advantage of any preventive or
corrective opportunities provided by the employer or to
avoid harm otherwise," *ibid.* Employers are thus subject
to a strong inducement to ferret out and put a stop to any
discriminatory activity in their operations as a way to
break the circuit of imputed liability. *Ibid.;* see also Brief
for Petitioner 24–28, and nn. 31–35 (citing studies demon-

strating that *Ellerth* and *Faragher* have prompted many employers to adopt or strengthen procedures for investigating, preventing, and correcting discriminatory conduct). The possibility that an employer might someday want to fire someone who might charge discrimination traceable to an internal investigation does not strike us as likely to diminish the attraction of an *Ellerth-Faragher* affirmative defense.

That aside, we find it hard to see why the Sixth Circuit's rule would not itself largely undermine the *Ellerth-Faragher* scheme, along with the statute's "'primary objective'" of "avoid[ing] harm" to employees. *Faragher*, *supra,* at 806 (quoting *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 417 (1975)). If it were clear law that an employee who reported discrimination in answering an employer's questions could be penalized with no remedy, prudent employees would have a good reason to keep quiet about Title VII offenses against themselves or against others. This is no imaginary horrible given the documented indications that "[f]ear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination." Brake, Retaliation, 90 Minn. L. Rev. 18, 20 (2005); see also *id.*, at 37, and n. 58 (compiling studies). The appeals court's rule would thus create a real dilemma for any knowledgeable employee in a hostile work environment if the boss took steps to assure a defense under our cases. If the employee reported discrimination in response to the enquiries, the employer might well be free to penalize her for speaking up. But if she kept quiet about the discrimination and later filed a Title VII claim, the employer might well escape liability, arguing that it "exercised reasonable care to prevent and correct [any discrimination] promptly" but "the plaintiff employee unreasonably failed to take advantage of . . . preventive or corrective opportunities provided by the employer." *Ellerth*, *supra,* at 765. Nothing in the statute's

8    CRAWFORD *v.* METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON CTY.

Opinion of the Court

text or our precedent supports this catch-22.[3]

Because Crawford's conduct is covered by the opposition clause, we do not reach her argument that the Sixth Circuit misread the participation clause as well. But that does not mean the end of this case, for Metro's motion for summary judgment raised several defenses to the retaliation charge besides the scope of the two clauses; the District Court never reached these others owing to its ruling on the elements of retaliation, and they remain open on remand.

## III

The judgment of the Court of Appeals for the Sixth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

---

[3] Metro also argues that "[r]equiring the employee to actually initiate a complaint . . . conforms with the employee's 'obligation of reasonable care to avoid harm' articulated in *Faragher* and *Ellerth*." Brief for Respondent 28 (quoting *Faragher* v. *Boca Raton*, 524 U. S. 775, 807 (1998)). But that mitigation requirement only applies to employees who are suffering discrimination and have the opportunity to fix it by "tak[ing] advantage of any preventive or corrective opportunities provided by the employer," *ibid.;* it is based on the general principle "that a victim has a duty 'to use such means as are reasonable under the circumstances to avoid or minimize . . . damages,'" *id.*, at 806 (quoting *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 231, n. 15 (1982)). We have never suggested that employees have a legal obligation to report discrimination against others to their employer on their own initiative, let alone lose statutory protection by failing to speak. Extending the mitigation requirement so far would make no sense; employees will often face retaliation not for opposing discrimination they themselves face, but for reporting discrimination suffered by others. Thus, they are not "victims" of anything until they are retaliated against, and it would be absurd to require them to "mitigate" damages they may be unaware they will suffer.

# SUPREME COURT OF THE UNITED STATES

————

No. 06–1595

————

## VICKY S. CRAWFORD, PETITIONER *v.* METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 26, 2009]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, concurring in the judgment.

The question in this case is whether Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §2000e *et seq.* (2000 ed. and Supp. V), prohibits retaliation against an employee who testifies in an internal investigation of alleged sexual harassment. I agree with the Court that the "opposition clause" of §2000e–3(a) (2000 ed.) prohibits retaliation for such conduct. I also agree with the Court's primary reasoning, which is based on "the point argued by the Government and explained by an EEOC guideline: 'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's *opposition* to the activity.'" *Ante*, at 4. I write separately to emphasize my understanding that the Court's holding does not and should not extend beyond employees who testify in internal investigations or engage in analogous purposive conduct.

As the Court concludes, the term "oppose" does not denote conduct that necessarily rises to the level required by the Sixth Circuit—*i.e.,* conduct that is "'consistent'" and "instigated or initiated" by the employee. 211 Fed.

2    CRAWFORD *v.* METROPOLITAN GOVERNMENT OF
NASHVILLE AND DAVIDSON CTY.

ALITO, J., concurring in judgment

Appx. 373, 376 (2006). The primary definitions of the term "oppose" do, however, require conduct that is active and purposive. See Webster's New International Dictionary 1709–1710 (2d ed. 1953); Random House Dictionary of the English Language 1010 (1966) (hereinafter Random Dict.); 10 Oxford English Dictionary 866–867 (2d ed. 1989). For example, the first three definitions of the term in the dictionary upon which the Court principally relies are as follows:

> "1. to act against or provide resistance to; combat. 2. to stand in the way of; hinder; obstruct. 3. to set as an opponent or adversary." Random Dict. 1359 (2d ed. 1987).

In accordance with these definitions, petitioner contends that the statutory term "oppose" means "taking action (including making a statement) to end, prevent, redress, or correct unlawful discrimination." Brief for Petitioner 40.

In order to decide the question that is before us, we have no need to adopt a definition of the term "oppose" that is broader than the definition that petitioner advances. But in dicta, the Court notes that the fourth listed definition in the Random House Dictionary of the English Language goes further, defining "oppose" to mean "'to be hostile or adverse to, *as in opinion.*'" *Ante*, at 4 (emphasis added). Thus, this definition embraces silent opposition.

While this is certainly *an* accepted usage of the term "oppose," the term is not always used in this sense, and it is questionable whether silent opposition is covered by the opposition clause of 42 U. S. C. §2000e–3(a). It is noteworthy that all of the other conduct protected by this provision—making a charge, testifying, or assisting or participating in an investigation, proceeding, or hearing—requires active and purposive conduct. "'That several items in a list share an attribute counsels in favor of

interpreting the other items as possessing that attribute as well.'" *S. D. Warren Co.* v. *Maine Bd. of Environmental Protection*, 547 U. S. 370, 378 (2006) (quoting *Beecham* v. *United States,* 511 U. S. 368, 371 (1994)).

An interpretation of the opposition clause that protects conduct that is not active and purposive would have important practical implications. It would open the door to retaliation claims by employees who never expressed a word of opposition to their employers. To be sure, in many cases, such employees would not be able to show that management was aware of their opposition and thus would not be able to show that their opposition caused the adverse actions at issue. But in other cases, such employees might well be able to create a genuine factual issue on the question of causation. Suppose, for example, that an employee alleges that he or she expressed opposition while informally chatting with a co-worker at the proverbial water cooler or in a workplace telephone conversation that was overheard by a co-worker. Or suppose that an employee alleges that such a conversation occurred after work at a restaurant or tavern frequented by co-workers or at a neighborhood picnic attended by a friend or relative of a supervisor.

Some courts hold that an employee asserting a retaliation claim can prove causation simply by showing that the adverse employment action occurred within a short time after the protected conduct. See, *e.g.*, *Clark County School Dist.* v. *Breeden,* 532 U. S. 268, 273 (2001) *(per curiam)* (noting that some cases "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case"); see also *Gorman-Bakos* v. *Cornell Cooperative Extension of Schenectady Cty.*, 252 F. 3d 545, 554 (CA2 2001); *Conner* v. *Schnuk Markets, Inc.*, 121 F. 3d 1390, 1395 (CA10 1997); *Dey* v. *Colt Constr. & Dev. Co.*, 28 F. 3d 1446, 1458

(CA7 1994). As a result, an employee claiming retaliation may be able to establish causation simply by showing that, within some time period prior to the adverse action, the employer, by some indirect means, became aware of the views that the employee had expressed. Where the protected conduct consisted of a private conversation, application of this rule would be especially problematic because of uncertainty regarding the point in time when the employer became aware of the employee's private expressions of disapproval.

The number of retaliation claims filed with the EEOC has proliferated in recent years. See U. S. Equal Employment Opportunity Commission, Charge Statistics: FY 1997 Through FY 2007, http://www.eeoc.gov/stats/charges.html; Charge Statistics: FY 1992 Through FY 1996, http://www.eeoc.gov/stats/charges-a.html (as visited Jan. 16, 2009, and available in Clerk of Court's case file) (showing that retaliation charges filed with the EEOC doubled between 1992 and 2007). An expansive interpretation of protected opposition conduct would likely cause this trend to accelerate.

The question whether the opposition clause shields employees who do not communicate their views to their employers through purposive conduct is not before us in this case; the answer to that question is far from clear; and I do not understand the Court's holding to reach that issue here. For present purposes, it is enough to hold that the opposition clause does protect an employee, like petitioner, who testifies about unlawful conduct in an internal investigation.